IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 2:17cr120 |
| | ) | |
| v. | ) | |
| | ) | |
| SHIVAM PATEL, | ) | |
| | ) | |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, G. Zachary Terwilliger, United

States Attorney, Andrew Bosse, Assistant United States Attorney, and Justin Sher, Trial

Attorney, National Security Division, Department of Justice, hereby submits its position with

respect to the defendant's sentencing.  In the Presentence Investigation Report ("PSR") prepared

in this matter, the United States Probation Office determined the applicable guidelines range to

be a term of 8-14 months of imprisonment, based on a Total Offense Level of 11 and a Criminal

History Category of I.  The Probation Office also stated an upward departure may be warranted

to reflect the actual seriousness of the offense.  PSR ¶ 76.  The statutory maximum sentence in

this case is 15 years—five years for Count One and ten years for Count Three (the government

dismissed Count Two as part the plea agreement).  The government does not seek the statutory

maximum period of incarceration in this case.  But it is seeking a significant upward variance

given the seriousness of the underlying criminal conduct and its strong nexus to terrorism.

In accordance with Section 6A1.2 of the Sentencing Guidelines Manual and this Court's

policy regarding sentencing, the United States represents it reviewed the PSR and consulted with

the Probation Office and defense counsel.  The government does not dispute the sentencing

factors set forth in the PSR, or the guidelines-range calculation.  In arriving at its requested sentence, the government considered each of the § 3553(a) factors, the PSR, and the facts underlying the defendant's conviction.  The United States respectfully submits that a sentence of 96 months of imprisonment, together with the maximum available term of supervised release, is appropriate and warranted in this case.  Such a sentence would be sufficient, but not greater than necessary, to accomplish the goals of 18 U.S.C. § 3553(a).

## I.    <u>Background</u>

On June 30, 2017, Shivam Patel ("Patel" or "defendant") was charged by criminal complaint with making material false statements in a matter within the jurisdiction of the executive branch, in violation of 18 U.S.C. § 1001(a).  Docket Nos. 1-2.  On July 20, 2017, a federal grand jury returned an indictment charging the defendant with two counts of making material false statements and writings in violation of 18 U.S.C. § 1001(a) (Counts One and Two) and one count of making a false statement in an application for a passport in violation of 18 U.S.C. § 1542 (Count Three).  Docket No. 15.  After the Court entered a protective order pursuant to Section 3 of the Classified Information Procedures Act (Docket No. 23), Patel agreed to plead guilty to Counts One and Three (Docket Nos. 30-35).  The Court scheduled the defendant's sentencing for 10:00 a.m. on June 4, 2018.  Docket No. 31.

While the charges of conviction are for making materially false statements to the United States Army and making false statements on an application for a United States passport, there is a strong connection between the defendant's conduct and his support for the Islamic State of Iraq and al-Sham ("ISIS")—a designated foreign terrorist organization ("FTO").  That organization has encouraged, and taken credit for, attacks against civilians throughout the world, including in the United States.  The stated goals of ISIS are to create and rule a caliphate, and ISIS fights

against any nations that oppose it. In part to accomplish those goals, ISIS has committed atrocities against many innocent people. Initially, ISIS encouraged supporters throughout the world, including the United States, to travel to Iraq and Syria to fight for the terrorist organization. Then, on or about September 21, 2014, Abu Muhammad al-Adnani ("Adnani")— who, prior to his death, served as an architect of ISIS's external operations and as ISIS's chief spokesman—issued a recorded statement calling for attacks against citizens, civilian or military, of the countries participating in the coalition against ISIS, including the United States. Al-Adnani specifically called on Muslims who support ISIS to "defend the Islamic State" and "to rise and defend your state from your place where you may be."[1] Stated differently, Al-Adnani called for ISIS supporters to attack from within the United States and other countries.

Patel traveled overseas with the goal of joining ISIS, or another designated FTO. Now that Patel has returned from Jordan, where he failed to connect with ISIS members, he poses a significant risk to the domestic security of the United States. Even before Patel traveled overseas, he researched ISIS, viewed ISIS propaganda, and made statements in support of ISIS. Patel praised ISIS-claimed attacks on the United States and its allies. He spoke glowingly of U.S. Army Major Nidal Hasan's attack on his fellow soldiers located on a military base, stating

---

[1] ISIS has continued to encourage supporters to conduct attacks in their homelands. The group claimed responsibility for the following terrorist attacks, among others: (1) on or about May 4, 2015, two ISIS supporters attempted an attack on the American Freedom Defense Initiative's Muhamad Art Exhibit and Cartoon Contest in Garland, Texas; (2) on or about November 13 and 14, 2015, a group of attackers carried out multiple terrorist attacks throughout Paris, France, which killed approximately 130 people; and (3) on or about March 22, 2016, a group of attackers carried out bombings in Brussels, Belgium, which killed at least 32 people.

ISIS relies heavily on social media, the Internet, and encrypted-communication applications to spread its hateful message and to recruit and mobilize supporters. Using these platforms, ISIS posts and circulates videos and updates of events in Syria, Iraq, and other ISIS-occupied areas, in English and Arabic, as well as other languages, to draw supporters to its cause. Members and supporters of ISIS frequently use a variety of electronic-communication systems in an attempt to avoid having their communications monitored by law-enforcement agencies.

the attack was "completely justified in my eyes" and that "Nidal Hussein [sic] died a martyr instead of a kafir."[2] Patel's praise of Hasan's attack—which resulted in the deaths of 13 servicemembers and the non-fatal shooting of many more—occurred not long before Patel himself attempted to join the United States Army. For these reasons, among the others detailed below, the government seeks an upward variance to 96 months of imprisonment in this case.

## II.    <u>Position on Sentencing and Argument</u>

Although the criminal charges in this case focus on Patel's false and fraudulent statements, the underlying conduct those statements were made to hide were Patel's support for ISIS and its violent agenda, and his attempt to travel to ISIS territory and join an FTO. The evidence suggests that—but for the Kingdom of Jordan's timely arrest of the defendant—he was destined for more substantial violent conduct. The Court's decision on sentencing in this case should be made only after considering the context of Patel's criminal conduct, its connection to an FTO, and the harm Patel wanted to cause before he was arrested. All of those factors, which the Sentencing Guidelines do not take into account, support a sentence significantly higher than the calculated guidelines range.

The U.S. Supreme Court held the U.S. Sentencing Guidelines are "effectively advisory." *United States v. Booker*, 543 U.S. 220, 245 (2005). The Supreme Court advised sentencing courts that even "[w]ithout the 'mandatory' provision, the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals," specifically citing those goals listed in 18 U.S.C. § 3553(a). *Id.* at 259; *see also United States v. Kimbrough*, 552 U.S. 85 (2007) (stating "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence."). The

---

[2] Maj. Nidal Hasan did not die in his attack on Fort Hood.

Supreme Court instructed sentencing courts to calculate the Guidelines range, permit the parties "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and pronounce a sentence taking into account all of the relevant factors. *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Courts generally use the preponderance of the evidence standard when finding facts at sentencing that do not increase the statutory maximum for a crime. *See*, *e.g.*, *United States v. Bell*, 667 F.3d 431, 441 (4th Cir. 2011). Once a defendant is determined guilty of the predicate elements of an offense, it is within the court's discretion to impose up to the maximum sentence authorized under the United States Code. *See*, *e.g.*, *United States v. Angle*, 254 F.3d 514, 518 (4th Cir. 2001) (sentencing error did not affect substantial rights where total sentence was within total statutory maximum prison term). In the event the sentencing court decides to impose a sentence at variance with a Guidelines calculation, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Gall*, 552 U.S. at 50 (stating a "major departure should be supported by a more significant justification than a minor one.").

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process. First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)). In making this determination, a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the

offense," as well as provide just punishment, afford adequate deterrence to other persons, protect the public, and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)). The court should impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)(2). Here, the nature and circumstances of the offense, the history and characteristics of the defendant, and the other applicable § 3553 factors support the government's recommended sentence of 96 months of imprisonment, followed by the maximum supervised release term available.

    A. <u>Nature and Circumstances of the Offense</u>

       The nature and circumstances of the offense are as serious as they come for defendants who make material false statements and file fraudulent passport applications. The Court should consider Patel's criminal conduct as far more serious than an individual who made false statements in the context of an interview with a law-enforcement officer. Likewise, unlike the many cases where passport-application fraud relates to immigration fraud and illegal re-entry cases, the passport fraud here was designed specifically to hide from the United States Army information relating to Patel's prior foreign travel. That information consists of records that would have shown Patel's arrest and deportation from Jordan—facts that likely would preclude Patel from receiving a security clearance and the opportunity to join the United States Army. At a minimum, the United State Army could have asked Patel questions about his time in Jordan when assessing whether to accept Patel's application. If he had been honest with the United States Army, it would have had been in position to learn perhaps the single most important fact about him: his affinity for a violent terrorist organization that asked its supporters to commit terrorist attacks in the United States and elsewhere.

Patel was the subject of a counterterrorism investigation that began around August 2016, when Patel—a citizen of the United States—was arrested and detained in Jordan. After learning of Patel's arrest overseas, the FBI began investigating his travel history and reasons for going to Jordan. In doing so, the FBI learned that Patel left the United States in July 2016 to teach English in China. But Patel unexpectedly left China in August 2016 and traveled to Jordan, after telling his parents he wanted to go to Mecca (which is in Saudi Arabia, not Jordan). After securing a search warrant, the FBI reviewed Patel's online search history and discovered that Patel conducted multiple searches for material related to ISIS, including for information on how to join ISIS and for ISIS-related propaganda videos. Statement of Facts, ¶ 4. Among other items, the FBI also discovered that Patel researched information relating to how one might evade a polygraph examination; downloaded at least three copies of Dabiq magazine; and saved stories published online about American reporters killed in Syria.

Following Patel's arrest overseas, the Jordanian government deported him back to the United States. The period between Patel's return to the United States and his arrest is full of concerning conduct demonstrating Patel's affinity for ISIS. For example, in September 2016, Patel explained to an Undercover Employee ("UCE") that he had just gotten out of a Jordanian prison and wanted to commit jihad and shahid (*i.e.*, martyrdom). Statement of Facts, ¶ 5. Though Patel suggested his jihad may not be violent, he praised the violent terrorist attacks in Paris and Nice. *Id.* Patel also praised Omar Mateen for killing homosexual people in Orlando, Florida. *Id.* And Patel discussed his admiration for Anwar al-Awlaki—an Islamic lecturer and a leader of Al-Qaeda in the Arabian Peninsula ("AQAP"), a Yemen-based designated foreign-terrorist organization that claimed responsibility for terrorist acts against targets in the United

States, Saudi Arabia, Korea, and Yemen since its inception in January 2009.[3]  *Id.*, ¶ 5, note 2.

Though such actions may include protected speech, the "Constitution does not erect a *per se*

barrier to the admission of evidence concerning one's beliefs and associations at sentencing

simply because those beliefs and associations are protected by the First Amendment."  *Dawson*

*v. Delaware*, 503 U.S. 159, 165 (1992).

Despite the utter barbarity of ISIS's murderous acts on civilians in pursuit of its

theological agenda, Patel was attracted to the group and specifically to its violent attacks on

civilians.  He told the FBI during a voluntary interview in September 2016 that he felt elated by

the success of the ISIS attacks in Paris and Orlando—so much so that after the attacks "he went

to the gym and worked out hard."  Patel also told the FBI that everyone who is not a "good

Muslim" is an infidel, and he does not care what happens to infidels.  Patel talked about his

admiration for ISIS and said he wants the caliphate to rise up and rule the world.  Patel also

stated he was trying to find his way in Islam, but that he did not think his way was on Earth.

Later in September 2016, Patel traveled to Detroit, Michigan.  While in Detroit, he

initiated a conversation with an FBI Task Force Officer ("TFO") at the airport.  Statement of

Facts, ¶ 6.  Patel spoke with the TFO about ISIS and explained his position that ISIS, while

extreme, is necessary.  *Id*.  Patel also told the TFO that he wanted to be "locked and loaded," and

while making that statement Patel gestured with his hands as if he were holding a rifle.  *Id*.

Later, while in Michigan and Virginia, Patel spoke to an FBI Confidential Human Source

("CHS").  Patel explained to the CHS that he went to Jordan to find like-minded Muslims.

Statement of Facts, ¶ 7.  He told the CHS that he went to Jordan to do something "bigger, better,

and more purposeful," which he described as dying in the cause of Allah.  *Id*.  Patel claimed that

---

[3] Pursuant to a Presidential Executive Order, Al-Awlaki was designated by the United States as a "Specially Designated Global Terrorist" on July 12, 2010.

his trip to Jordan was a spur-of-the-moment decision, and said he did not want to return to the United States. *Id*. He also said that when he was not able to meet a contact in Jordan, he asked Jordanian taxi drivers about their feelings on ISIS and Jabhat al-Nusrah.[4] *Id*.

Most concerning, Patel expressed a desire to blend into society and do something "glorious." Statement of Facts, ¶ 8. Patel told the CHS he wanted to make the "kuffar"—a derogatory term for non-Muslims—suffer. *Id*. He specifically suggested that Allah might bring a disease "worse than AIDS" on the United States that would kill all the "kuffars." PSR ¶ 10. Patel also described his desire for a war between Muslims and non-Muslims, and said he wanted to join a Muslim army and receive training. *Id*. While Patel, at times during his conversations with the CHS, questioned whether it was appropriate for ISIS to attack civilians, he was emphatic that Major Hasan's attack was justified.[5] Indeed, Patel found the attack to be "100% justified may Allah curse the soul of those who think otherwise." In that attack, which occurred on November 5, 2009, Major Hasan fatally shot 13 servicemembers and injured more than 32 other individuals on Fort Hood. Statement of Facts, ¶ 10. Patel's view was that such an attack would earn one martyrdom. *Id*.

Patel also discussed his affinity for ISIS, based in part on Patel's feeling that ISIS members are true Muslims. *Id*., ¶ 8. He told the CHS that he watched videos and read articles about ISIS. *Id*. Patel even memorized and sang a "Jihad Nasheed"—an ISIS fight song—to the CHS. Patel also told the CHS that he made an ISIS flag and wanted to replace his neighbor's

---

[4] Like ISIS, Jabhat al-Nusrah is a designated foreign terrorist organization.

[5] Patel's statements questioning ISIS's methods and attacks on civilians should be considered in context. Patel, for instance, talked about being careful with what he said when he was around the CHS because Patel was concerned the CHS might be working with law enforcement.

American flag with the ISIS flag. *Id*. And he told the CHS that the two of them would "make hijra" together, and that while "no one said it would be easy … we will be patient."

Not only are Patel's actions far more serious than the conduct in typical false-statement cases, but his criminal conduct is at least as concerning as that of many other individuals who have attempted to travel overseas for the purpose of joining ISIS. Patel researched ISIS online and strategically planned his travel to avoid arrest. Unlike many others arrested for the same crime, he actually made it overseas to Jordan, which shares a border with Syria. Patel told the CHS that he chose to travel through Jordan, as opposed to Turkey, because he did not want to get caught like everyone else. *Id*. Patel found ISIS videos online before traveling, and he felt connected to ISIS's message (despite the horrific violence); indeed, he told the CHS that ISIS called to him through the videos, telling him to "come to your State." PSR, ¶ 11. Although Patel went to Jordan intending to join "The State," he told the CHS that traveling to ISIS was not easy as suggested by the videos and articles, which did not provide directions on how to join "The State." *Id.*

After his deportation from Jordan, Patel moved into his parents' home in Williamsburg, Virginia. Statement of Facts, ¶ 9. Patel began applying for a number of jobs, many of which would allow him to be armed and to receive firearms training. He applied to local police departments, correctional facilities, and the United States military, including the United States Army and the United States Air Force, among other places. *Id*. On November 30, 2016, Patel called the United States Army recruiting office to inquire about the Officer Candidate Selection process. Statement of Facts, ¶ 11. On December 13, 2016, Patel met with an Army Recruiter (the "Army Recruiter"). *Id*. During the meeting, Patel submitted his application to the United States Army. *Id*. The Army Recruiter reminded Patel that the information provided as part of

the application process had to be true and accurate. *Id*. Patel was specifically reminded—as is stated on the questionnaire form itself—that withholding, misrepresenting, or falsifying information on the form could subject him to criminal penalties. *Id*.

Nevertheless, merely three months after being arrested in Jordan, where he had tried to find ISIS, Patel told the United States Army that he had only traveled outside of the United States on one occasion in the previous seven years—that being a family trip to India in 2011-2012. *Id*. Patel lied and purposefully omitted from the application his foreign travel to China and Jordan—the very information that would have led to inquiries about his arrest and deportation from Jordan, which, in turn, would have tipped off the Army that an ISIS sympathizer, who actually traveled overseas for the purpose of joining group, was now applying to be an Army officer. Patel's lie is especially troublesome when considered together with Patel's actions and statements of support for ISIS, particularly Patel's statements relating to Major Hasan, who attacked his fellow servicemembers on a military base Hasan could only access by virtue of being in the military. It is appropriate to be seriously concerned about Patel's conduct and intentions given his chosen role models, his subsequent application to the military, and his statements that targeting American combatants was justified.

Patel's fraudulent application to the State Department for a new passport shows the extent to which he was willing to hide his past travel from the military. Once the Army Recruiter told Patel that he needed to show his real passport to the Army Recruiter, which would have confirmed Patel's citizenship and previous foreign travel, Patel could have walked away from his lies and deception. Instead, he doubled down. Indeed, because Patel's passport showed his travel to China and Jordan, and indicated that he had been deported (the United States Embassy in Jordan stamped Patel's passport as valid only for return transit to the United States),

Patel could not show the Army Recruiter the passport without telling the truth and confirming that he had lied on his application. To avoid revealing his past to the Army, Patel told the Army Recruiter that he would bring the passport at a later date. Statement of Facts, ¶ 12.

Patel then lied again—he took the additional affirmative step of applying for a new passport that would not bear evidence of his prior travel or deportation. Two days after interviewing with the Army, Patel submitted to the Department of State an application for a replacement United States passport. *Id*. The Department of State asks applicants to "[e]xplain how your U.S. passport book/card was lost or stolen" as part of the application. *Id*. In response, Patel wrote that he had accidentally thrown his passport in the garbage nearly two months earlier. *Id*. On July 6, 2017, soon after arresting Patel, the FBI recovered Patel's passport in the very hotel in which Patel was residing. Statement of Facts, ¶ 14.

Patel did not limit his inquiries to the United States Army. He made the same application, and chose to make the same lie by omission, to the United States Air Force. On December 1, 2016, Patel emailed an Air Force recruiter to ask about the Officer Candidate Selection process. Statement of Facts, ¶ 13. On January 30, 2017, Patel met with an Air Force recruiter in Virginia Beach. *Id*. During the meeting, Patel submitted his application for the United States Air Force Officer Candidate Selection Process and the Form SF-86 Questionnaire for National Security Positions he had filled out as part of the application process. *Id*. The SF-86 form he submitted to the Air Force contained the same false statement regarding foreign travel he had made to the Army. *Id*. Patel signed the SF-86 form during a January 30, 2017, meeting with the Air Force Recruiter. *Id*.

While Patel made several statements to the CHS (whom Patel was concerned about as a potential informant for the police) about wanting to join the military for non-terroristic reasons,

Patel also expressed a desire to "blend into society" and to get "training" and eventually join a "Muslim army." More concerning, Patel applied to two different branches of the military—and discussed potentially applying to the United States Navy and the United States Coast Guard—after attempting to find ISIS overseas and unequivocally stating his support for a domestic terror attack by a uniformed military officer against his fellow servicemembers. The charges of conviction in this case relate to Patel's attempts to prevent the United States Army from finding out about those facts before he too could join and receive the training he wanted; the underlying conduct, however, portrays actions that potentially could have been far worse.

Patel is, and will remain, an extraordinarily dangerous person who is inspired by ISIS and Major Hasan. Though Patel potentially is subject to the terrorism enhancement under the Sentencing Guidelines (*see infra*), which would recommend a sentence at the 15-year statutory maximum in this case, the United States is seeking a sentence of eight years of imprisonment. Such a sentence would reflect the seriousness of the offense and provide just punishment for Patel's conduct. It also would promote both specific and general deterrence—and, at least while the defendant is incarcerated, the sentence would serve to protect the public from Patel.

For the same reasons, the government submits that the maximum three-year term of supervised release is appropriate. Given the severity of the defendant's lies and intended actions, the Court should include the maximum available supervised-release term as part of Patel's sentence.

B. The History and Characteristics of the Defendant Support a Significant Sentence

Patel was fortunate to have had a stable upbringing and supportive parents. He described his relationship with his parents as "close" and indicated his parents are "very supportive" of him. PSR, ¶ 46. He denied suffering from any form of physical, sexual, or emotional abuse. *Id.*,

13

¶ 47.  Despite such a supportive upbringing, however, Patel made the choice to embrace ISIS and its gruesome violence, decided to travel overseas to seek out the group, and only came back to the United States because he was arrested and deported by Jordan.  It is significant that Patel began his embrace of ISIS while located in the safety of his parents' home in Virginia.

The FBI interviewed Patel's parents at their home in Williamsburg.  The parents told the FBI that Patel converted to Islam several years ago and became "obsessed with Islam."  They also told the FBI that Patel had a "troubled childhood," and that he suffered from anxiety, tried to slit his wrists, and underwent a psychiatric evaluation.  PSR, ¶¶ 51-54.  Patel told the probation officer that he has been off mental-health medication since around 2009, and he denied having any current suicidal thoughts.  PSR, ¶ 51.  But Patel has a history of mental-health problems that includes violence.  In 2008, while admitted to a hospital, Patel tried to harm a therapist.  PSR, ¶ 52.  Although Patel has had multiple episodes of psychosis, he no longer takes any psychiatric medication.  Patel is also a cancer survivor; he was diagnosed at the age of 12 with Hodgkin's lymphoma, which went into remission after he received chemotherapy.  PSR ¶ 50.

While the defendant has experimented with certain drugs (PSR, ¶ 55), he cannot blame his fascination with extremism on drug use or alcohol abuse, which was minimal.  Nor can Patel claim general ignorance: he attended a number of colleges, earned a Bachelor's degree, and then reportedly earned a teaching certificate from the University of Toronto.  PSR, ¶¶ 56-64.

Patel is capable of working, and he has worked in a number of different jobs, including for Busch Gardens and as an English teacher.  PSR, ¶¶ 67-68.  Patel had stable, long-term employment through his parents' motel business.  PSR ¶ 66.  That Patel applied to join the military and various police departments—all of which would have allowed Patel to be armed and to receive firearms training—is significant.  Patel has a college degree and a lengthy employment

record, indicating he likely would be competitive for many jobs that do *not* require weapons and firearms training. Yet Patel focused his employment search on the military and police departments while talking about the success of Major Hasan.

      C.   <u>The Seriousness of the Offense Warrants a Significant Sentence</u>

      The Court should sentence Patel consistent with the seriousness of his offense conduct. In this case, the offense is far more serious and troubling than the typical false-statements case or passport-fraud case. Patel made his false statements only after traveling overseas, to join ISIS, and Patel's false statements were designed to help him join the United States Army without tipping the Army off about his ideological motivations for doing so. That Patel applied to the United States Army mere weeks after expressing unqualified support for the cowardly attack of Major Hasan and just months after returning from his unsuccessful trip to Jordan raises Patel's criminal conduct from concerning to extremely serious. In a way, Patel is extremely fortunate this case played out as it did: Patel was deported from Jordan before he could connect with like-minded individuals to complete his "shahid," and he was arrested in the United States before he joined the military and took any further destructive actions. Under either scenario, the crimes of conviction would have been significantly more serious, and the government would not have limited its requested sentence to anything close to eight years. Patel's conduct, therefore, is serious enough to merit a significant upward variance. No sentence within or even near the guidelines range adequately accounts for the facts and circumstances of his conduct.

      In fact, although the government chose not to seek it in this case, Patel's criminal conduct may have made him eligible for the terrorism enhancement under the Sentencing Guidelines. The U.S.S.G. § 3A1.4 enhancement applies when the government proves by a preponderance (1) that the defendant was convicted of an offense that involved, or was intended to promote, a

federal crime of terrorism, and (2) that the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, app. 4.A.[6]  The sentencing enhancement provided by § 3A1.4 automatically increases the offense level to 32 and the criminal history category to VI.  U.S.S.G. § 3A1.4(a), (b).

Courts have recognized that the structure of § 3A1.4 establishes two bases for applying the enhancement.  *See*, *e.g.*, *United States v. Arnaout*, 431 F.3d 994, 1001–03 (7th Cir. 2005); *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004); *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001).  The first—if the offense "involved" a federal crime of terrorism—applies when "a defendant's offense or relevant conduct includes a federal crime of terrorism."  *Arnaout*, 431 F.3d at 1001.  Thus, under the first basis, "an offense 'involves' a federal crime of terrorism only if the crime of conviction is itself a federal crime of terrorism," or if the "relevant conduct includes such a crime."  *See United States v. Awan*, 607 F.3d 306, 313–14 (2d Cir. 2010); *United States v. Parr*, 545 F.3d 491, 504 (7th Cir. 2008).

Alternatively, the enhancement applies "[i]f the offense … was intended to promote [ ] a federal crime of terrorism."  U.S.S.G. § 3A1.4(a); *Arnaout*, 431 F.3d at 1001.  "A defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime[.]"  *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001).  "[I]nstead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism."  *Graham*, 275 F.3d at 516.  In such cases, "the terrorism enhancement does not hinge upon a defendant's

---

[6] Section 3A1.4 provides a 12-level increase in the offense level, with a minimum offense level floor of 32, and an increase of the criminal history category to level VI if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism.  U.S.S.G. § 3A1.4 (2016).

ability to carry out specific terrorist crimes or the degree of separation from their actual implementation. Rather, it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorist crime, the enhancement is triggered." *Mandhai*, 375 F.3d at 1248.

"[T]he Guidelines expressly acknowledge that an obstruction offense," like Patel's, "may support the enhancement" under the "intended to promote" prong. U.S.S.G. § 3A1.4. The Guidelines provide "an offense that involved … obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism." U.S.S.G. § 3A1.4 cmt. n.2. That certainly makes sense to the extent that a defendant can intend to promote a crime by "try[ing] to prevent the government from finding out about it." *United States v. Ashqar*, 582 F.3d 819, 826 (7th Cir. 2009). "[T]he word 'promote,' as used in § 3A1.4, signifies that where a defendant's offense or relevant conduct helps or encourages a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)(B), then § 3A1.4 is triggered." *Arnaout*, 431 F.3d at 1002. There is evidence that Patel intended to promote a federal crime of terrorism by making materially false statements about his travel history for the purpose of obtaining a position with the United States Army, where Patel would have received a security clearance, firearms training, and government-issued weapons.

With respect to the second element, "the application of § 3A1.4 … does not require a finding that [the defendant] was personally motivated by a desire to influence or affect the conduct of government. Rather, the government need only demonstrate that [the defendant] intended to promote a crime calculated to have such an effect … whatever [the defendant's] reason for committing them." *United States v. Awan*, 607 F.3d 306, 315-16 (2d Cir. 2010); *see United States v. Jayyousi*, 657 F.3d 1085, 1114-15 (11th Cir. 2011) ("[T]he Guidelines's precise language focuses on the intended outcome of the defendants' unlawful acts—i.e., what the

activity was calculated to accomplish, not what the defendants' claimed motivation behind it was."). Patel sought to deceive the military and the Department of State about his travel history; had he been successful, Patel would have had access to weapons and military bases, like Major Hasan. That access, coupled with his desire to be a "true Muslim," as Patel described ISIS members, and his desire to do something "glorious" and make the "kuffar suffer," would have been extraordinarily dangerous for civilians and military alike.

Despite the option of requesting the terrorism enhancement, however, the government does not seek the application of the enhancement, and it does not seek the statutory maximum of 15 years of imprisonment. Instead, the government seeks an appropriate sentence of 96 months, followed by the maximum available period of supervised release. Courts repeatedly have emphasized that persons convicted of terrorism-related offenses should receive lengthy sentences. *See United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) ("Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."); *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."). Patel was not charged with a terrorism offense. But he did everything in his power to support ISIS, including travel in an attempt to link up with ISIS members, and, when that failed, his attempt to join the United States military while hiding the very facts that would have allowed the military to learn about his true intentions. An extensive period of imprisonment is just punishment and necessary to serve as a deterrent to him and others.

D.  <u>The Court Should Impose a Significant Sentence In Part To Afford Adequate
Deterrence to Patel and Other Individuals and To Protect the Public</u>

Because all Army officers are required to have a national-security clearance, the

application procedures for the Army (and other military branches) require applicants to respond

truthfully to all questions.  This case illustrates as well as any the importance of that requirement.

Had Patel been truthful, the Army Recruiter would have known that Patel recently had been

deported from Jordan.  Moreover, the Army Recruiter and would have had the basic information

necessary to determine that Patel should not under any circumstances be granted a security

clearance or receive the kinds of weapons training provided by the military.  A significant

sentence in this case will meet the goals of both general and specific deterrence.  As to specific

deterrence, the government is hopeful—though of course it cannot be sure—that serving time in

federal prison will deter Patel from taking any additional action in furtherance of the ISIS

ideology he embraced before and after traveling overseas.  A significant sentence also will have

a general deterrence effect by demonstrating the serious consequences that follow lying to the

military, law enforcement, or other executive-branch divisions for the purpose of gaining access

to military training, military weapons, or a national-security position after attempting to join a

terrorist group.

E.  <u>The Court Should Apply an Upward Variance</u>

This is a unique case, and the government does not lightly ask for a sentence so high

above the calculated guidelines range.  The actual seriousness of the offense conduct goes well

beyond the typical false-statement or passport-fraud case, which normally does not implicate the

national security to such a high degree.  Patel embraced extremism and took positive steps to join

an FTO.  When that failed, and he was returned to this country, Patel did not give up.  Even an

interview with the FBI did not dissuade Patel from his embrace of an extremist ideology, or his

desire to act on it. Instead, the defendant took affirmative steps to join the U.S. military and then further steps of lying about his past and submitting a fraudulent passport application to cover for that lie (and potentially further his ultimate motivation of joining the military while "blend[ing]" into society before doing something "glorious" like dying in the name of Allah). Whatever Patel now claims about his ideological affiliations, he presents, and will continue to present, a significant danger to others. The government's requested sentence takes Patel's entire conduct into account and will serve to protect the public and afford just punishment for the offenses.

IV. **Conclusion**

For the reasons stated above, the government submits that a sentence of 96 months' imprisonment, plus a three-year term of supervised release, is appropriate, and not greater than necessary.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____/s/_____
Andrew Bosse
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
andrew.bosse@usdoj.gov

Justin Sher
Trial Attorney, Counterterrorism Section
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Office Number: 202-353-3909
Facsimile Number: 202-514-8714
justin.sher@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of May, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

I HEREBY CERTIFY that on this 29th day of May, 2018, I sent by electronic mail a true and correct copy of the foregoing to the following:

> Leah D. Greathouse
> Senior U.S. Probation Officer
> 600 Granby Street, Suite 230
> Norfolk, Virginia 23510

> _____/s/_____
> Andrew Bosse
> Assistant United States Attorney
> United States Attorney's Office
> 101 West Main Street, Suite 8000
> Norfolk, VA 23510
> Office Number: 757-441-6331
> Facsimile Number: 757-441-6689
> andrew.bosse@usdoj.gov