1

1        IN THE UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF VIRGINIA
2                NORFOLK DIVISION


3


4   UNITED STATES OF AMERICA,      )
                                   )
5            Plaintiff,            )
                                   )
6   v.                             )    Criminal Action No.:
                                   )         2:17cr120
7   SHIVRAM PATEL,                 )
                                   )
8            Defendant.            )


9


10               TRANSCRIPT OF PROCEEDINGS

11                    (Sentencing)

12

13                 Norfolk, Virginia
                    June 4, 2018

14

15  BEFORE:      THE HONORABLE MARK S. DAVIS
                 United States District Judge
16

17

18  Appearances:

19       OFFICE OF THE UNITED STATES ATTORNEY
                 By: ANDREW BOSSE, ESQUIRE
20                   Counsel for the United States

21       CLANCY & WALTER, PLLC
                 By: TIMOTHY GERARD CLANCY, ESQUIRE
22                   Counsel for Defendant

23

24       The Defendant appearing in person.

25

```
1                     P R O C E E D I N G S

2

3            (Proceedings commenced at 10:06 a.m. as follows:)

4

5            COURTROOM DEPUTY CLERK:  In Case No. 2:17cr120, the

6   United States of America v. Shivram Patel.

7            Mr. Bosse, is, the government ready?

8            MR. BOSSE:  The government's ready.  Good morning,

9   Your Honor.

10           THE COURT:  Good morning, Mr. Bosse.

11           COURTROOM DEPUTY CLERK:  Mr. Clancy, is the defendant

12  ready to proceed?

13           MR. CLANCY:  He is.  Good morning, Judge.

14           THE COURT:  Good morning, Mr. Clancy.

15           Mr. Clancy, would you and Mr. Patel step to the podium

16  so that the clerk can administer the oath to Mr. Patel?

17           (Defendant placed under oath.)

18           THE COURT:  All right.  Let's review some of the

19  history that brings us to this point.

20           On January 25, 2018, this court entered an order

21  authorizing a U.S. magistrate judge to conduct guilty plea

22  proceedings in the case.  On February 8, Mr. Patel requested and

23  consented to the magistrate judge conducting the guilty plea

24  proceedings, and on that same date, in accordance with the terms

25  of a written plea agreement, Mr. Patel appeared before
```

1  Magistrate Judge Lawrence Leonard and pled guilty to two counts

2  of the indictment, Count 1, making false statements and a false

3  writing in a matter within the jurisdiction of the Executive

4  Branch of the United States, in violation of Title 18 of the

5  U.S. Code, Section 1001(a) and Count 3, making a false statement

6  in an application for a passport in violation of Title 18 of the

7  U.S. Code, Section 1542.

8          Judge Leonard accepted the guilty plea, and the matter

9  was then continued for sentencing.

10          The Court has now received and reviewed the

11  presentence report that was prepared in this case by the

12  probation officer, and I have that and have carefully reviewed

13  it.

14          In addition to the presentence report and the -- which

15  was prepared on April 25, 2018, and the addendum prepared on

16  May 17, 2018, the Court has been provided with many letters.

17  First I have an unsigned allocution letter from Mr. Patel.

18          MR. CLANCY:  Judge, I do have a signed letter at this

19  point.

20          THE COURT:  All right.  You can hand that up to the

21  court security officer.

22          MR. CLANCY:  It was signed this morning, Your Honor.

23          THE COURT:  Thank you.

24          MR. CLANCY:  Thank you.

25          THE COURT:  And there's no other changes to it other

1    than the signature?

2           MR. CLANCY:  There were not, Judge.  I think we just

3    explained why we couldn't get him to sign it ahead of time.

4           THE COURT:  Okay.  Then I have letters from the

5    following individuals:  Rashmikant Patel, the defendant's

6    father.  Jayshree Patel, his mother.  Shantilal Patel, his

7    grandfather.  Runjal Patel, his brother.  Harikrishna Patel,

8    uncle.  Pranav Parikh, his doctor.  Hetal Peters, his cousin.

9    Vinay Ronvelia, a family friend, Rotnam Patel and Sangita Patel,

10   family friends.  George Mathew, a family friend.  Gunatit Patel,

11   a friend and religious coordinator.  Manu Bhagat, defendant's

12   grandmother's brother.  Chirag Dalia, defendant's cousin.  Gira

13   Ptel, his cousin.  Simpson Zhang, his close friend.  Patricia

14   MacKenzie, a work associate and friend.  Elizabeth Pan,

15   spiritual leader.  Shilpa Akhani, defendant's cousin.  Albert

16   Randall, a neighbor.  And Tushar and Piyusha Gajjar, family

17   friend.

18           Mr. Clancy, did I get them all?

19           MR. CLANCY:  You did, sir.

20           THE COURT:  Okay.  These letters, other than the

21   letter from his physician, don't really contain the kind of

22   medical information that I would typically attach to the

23   presentence report.  Do you want any of these attached to the

24   presentence report?

25           MR. CLANCY:  That's not necessary, Judge.  I just

1  needed them to be considered at sentencing.

2          THE COURT:  Okay.  How about the letter from his

3  physician?

4          MR. CLANCY:  The same.  I think it's general enough,

5  the same consideration.

6          THE COURT:  All right.  So they'll be maintained,

7  they're on the docket already because they were filed as part of

8  your position statement.

9          MR. CLANCY:  Yes, sir.

10         THE COURT:  Okay.  So when Mr. Patel appeared before

11  Judge Leonard he was asked many questions to determine whether

12  he was pleading freely, knowingly and voluntarily and

13  intelligently, and the Court at that time determined that he was

14  so pleading and recommended that this Court accept the plea

15  agreement and make the finding of guilt.  I'm prepared to do

16  that.  Is there any reason that I should not accept the plea

17  agreement and make the finding of guilt, Mr. Clancy?

18         MR. CLANCY:  No, sir.

19         THE COURT:  Mr. Patel?

20         THE DEFENDANT:  No, Your Honor.

21         THE COURT:  All right.  Then I do accept the plea

22  agreement and I do make the finding of guilt in this case as to

23  both counts.

24         Now, Mr. Clancy, have you reviewed the presentence

25  report and the addendum and had enough time to review it with

1    Mr. Patel?

2              MR. CLANCY:  I have, sir.

3              THE COURT:  Did you see any errors you need to bring

4    to my attention?

5              MR. CLANCY:  No, sir.

6              THE COURT:  And Mr. Patel, have you reviewed the

7    presentence report with the addendum?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Did you have enough time to review that

10   report with your attorney?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  Are there any errors contained in the

13   report?

14             THE DEFENDANT:  No, Your Honor.

15             THE COURT:  And do you believe that this report fully

16   covers your background?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  Since there are no disputed

19   issues, the Court will adopt the factual statements that are

20   contained in the presentence report as its findings of fact in

21   this case.

22             We move on to discuss the statutory punishments

23   established by Congress and the President and then the

24   sentencing guideline range established by the United States

25   Sentencing Commission.

1           First, the statutory punishment for the counts for

2    which the defendant has been found guilty is as follows:  For

3    Count 1 a maximum term of five years imprisonment, and for

4    Count 3, a maximum of 10 years imprisonment.  As for supervised

5    release, each count authorizes a term of supervision not to

6    exceed three years.

7           Mr. Bosse, do you agree that I've accurately stated

8    those?

9           MR. BOSSE:  Yes, sir, Your Honor.

10           THE COURT:  And do you, Mr. Clancy?

11           MR. CLANCY:  I do, sir.

12           THE COURT:  Moving on to the Sentencing Guidelines.

13   It appears that application of the advisory sentencing

14   guidelines results in an offense level of 11 and a criminal

15   history category of I, and the resulting advisory sentencing

16   guideline range is eight to 14 months of imprisonment.

17           Mr. Bosse, of course I'm aware that you have requested

18   a significant upward variance which the defense opposes.

19   However, with respect to the guideline range that I've already

20   stated, do you agree that I've accurately stated the range?

21           MR. BOSSE:  I do, Your Honor.

22           THE COURT:  Do you, Mr. Clancy?

23           MR. CLANCY:  I do, Judge.

24           THE COURT:  Mr. Bosse, will the government have any

25   additional evidence or materials to present today or just

1  argument?

2          MR. BOSSE:  Just argument, sir.

3          THE COURT:  Mr. Clancy, do you have any additional

4  materials or evidence to present?

5          MR. CLANCY:  I do, Judge, and I don't believe Mr.

6  Bosse has any objection.  I have -- it's a heavily redacted

7  document, Intelligence Note from the FBI.  The first is multiple

8  pages dated March 31, 2017 and then a followup dated April 7,

9  2017 consisting of one, total of two pages.

10         THE COURT:  Can you pull that microphone up to you and

11 make sure the green light is on?

12         MR. CLANCY:  It is.  Should I repeat what I just said?

13         THE COURT:  No, that's fine.

14         MR. CLANCY:  Judge, I believe in discussing this with

15 Mr. Bosse I believe it's incumbent these two documents be filed

16 under seal.  They're heavily redacted, there's not much to read,

17 but what is in these two documents is certainly going to be

18 relied on by counsel.  So I'd ask, formally ask these be

19 introduced as Defendant's Exhibit 1, albeit under seal.

20         THE COURT:  Were these documents produced pursuant to

21 the Classified Information Procedures Act?

22         MR. CLANCY:  Yes, sir.  And there is a protective

23 order attached to them.

24         MR. BOSSE:  They're produced pursuant to the

25 protective order that was entered pursuant to CIPA, yes, sir,

```
 1   Your Honor.

 2            THE COURT:  But they're still redacted?

 3            MR. BOSSE:  They are.  They are so redacted, Your

 4   Honor.  Portions of the document are redacted.

 5            THE COURT:  Because of a higher classification than

 6   the material therein?

 7            MR. BOSSE:  I could address briefly, I could do it

 8   here standing?

 9            THE COURT:  Okay.  That's fine.

10            MR. BOSSE:  Your Honor, the procedure we used under

11   CIPA to try to get the defense as much information as we could

12   as soon as we could, portions of this document were

13   declassified, and those portions were turned over to the defense

14   under the protective order.  We never got through the entire

15   CIPA briefing process through Section III and Section IV, in

16   which case the portions that are currently under seal would have

17   gone to the Court for the Court's review, and if they were

18   material and helpful to the defense, could have been turned

19   over.  I know what's in them and the defense has what's material

20   here from this intelligence report.  I can say that to the

21   Court.

22            THE COURT:  I just have to make sure that if you're

23   asking me to seal something that there's an appropriate basis on

24   which to do it.  That's why I'm asking you to provide me with

25   that basis.
```

1    MR. BOSSE:  Yes, sir, Your Honor.  For that, for the

2  basis for sealing, I would reference the protective order that's

3  currently in place.  I wasn't -- I didn't know this was coming

4  in today, I haven't prepared an argument on sealing.  We could

5  do that after the fact if necessary.  But standing here today, I

6  can only rely on the protective order for the request to seal.

7    THE COURT:  So the protective order was entered for

8  the material in its currently redacted form?

9    MR. BOSSE:  That's correct, Your Honor.

10    MR. CLANCY:  Yes, sir.  And the reason I would like to

11  use it, Judge, I think -- and I'm relying on Mr. Bosse's

12  integrity, which I have no question about, but the conclusions

13  that are drawn, there's very little specifics, but the

14  conclusions drawn from the FBI investigation are particularly

15  significant in my discussions with you in terms of sentencing.

16  And that's why I wanted the Court to consider that.

17    THE COURT:  And the government has no objection to the

18  conclusions being referenced?

19    MR. BOSSE:  None at all, Your Honor.

20    THE COURT:  However, you're saying that the protective

21  order, when it was entered, was based upon a finding of risk

22  that was outlined in the motion for entry of the protective

23  order?

24    MR. BOSSE:  That's right, Your Honor.  And there may

25  be a scenario where -- I mean, the portions here have been

1    declassified, but standing here today, I don't want to say let's

2    file it on the record without having recourse to review the

3    protective order, speaking with people in D.C.  There's a whole

4    host of issues as far as what we're going to do right at this

5    moment.  But certainly I've discussed this with Mr. Clancy, no

6    problems with the conclusions being referenced.  The last

7    paragraph of the statement of facts is partially drawn from

8    this, and I myself will be referencing it in my argument.

9           THE COURT:  Okay.  So you can provide that to me.

10   It's already been sealed pursuant to the protective order?

11          MR. CLANCY:  Yes, sir.

12          THE COURT:  So I don't need to do anything else.

13          MR. CLANCY:  I don't believe so.  Other than --

14          THE COURT:  But the order of the court stands.

15          MR. CLANCY:  Yes, sir.

16          THE COURT:  Okay.

17          MR. CLANCY:  I would ask the Court to review it.  It's

18   not that lengthy.  It's heavily redacted.  That's all the

19   evidence I have, Judge.  I just have comments then as well.

20          THE COURT:  Do you want me to review it right now?

21          MR. CLANCY:  I'm going to be referencing it, I'll be

22   directing the Court's attention to the portions I would like the

23   Court to pay attention to.

24          THE COURT:  Okay.  So I'll just do it as you are

25   talking.

1            MR. CLANCY:  Sure.

2            THE COURT:  All right.  So then why don't we go

3  ahead -- and it's going to be part of your argument though, it's

4  not part of a proffer?  In other words, are you going to

5  incorporate this into your argument or are you going to make a

6  proffer right now and then make argument after Mr. Bosse?

7            MR. CLANCY:  No.  Now it's in evidence I'm going to

8  reference it as part of my argument probably in rebuttal to some

9  or much of what Mr. Bosse is about to say.

10            THE COURT:  All right.  So I'll be happy to hear from

11  Mr. Bosse.

12            MR. CLANCY:  Thank you, Your Honor.

13            THE COURT:  You all can have a seat.

14            MR. BOSSE:  Thank you, Your Honor.

15            As Your Honor knows, we are asking for a significant

16  upward variance in this case.  And our position is that this is

17  far from a run of the mill false statements or passport fraud

18  case.  False statement cases happen most often in the context of

19  an interview with law enforcement where someone lies or attempts

20  to otherwise mislead or obstruct justice.  Passport fraud

21  charges happen most often in the immigration context, where

22  people are running passport mills or otherwise fraudulently

23  altering documents to try to get into the United States.

24            Here, the two charges of conviction have to be looked

25  at in context taking into account all of the relevant conduct in

1    the case because it's the recent conduct that bears on

2    materiality of the false statements and shows why they were made

3    and then why the passport fraud was then made to cover up the

4    false statements.

5         I'll talk briefly -- or maybe not briefly, about the

6    nature and circumstances of the offense.  In July 2016, Mr.

7    Patel travels to China to teach English, but before he did that,

8    he's researching ISIS, including things like how to join ISIS,

9    he's viewing ISIS propaganda.  He even showed it, I believe, to

10   a family member.  He's running searches for how to evade

11   polygraph tests.  And before he left, by his own admission, he

12   made himself an ISIS flag.  He's full of praise for radical

13   extremism, including lecturer Anwar Al Alaqui, whose lectures

14   are a well-known gateway into this way of life.  And he, by his

15   own admission, devoured them before he left and took every

16   message from Alaqui had to heart.

17        He wasn't in China long.  He had a number of issues

18   over there with his job.  I believe he made some statements

19   about doing violence to people who insulted the Prophet

20   Muhammad, and that was just one of a number of problems.  The

21   job was not a good fit for him in China.  He had problems with

22   his employer, problems with his students, and he left.  And he

23   was supposed to be flown back to Richmond to go back home, and

24   instead he changed his ticket to end up in Oman, Jordan.  This

25   is now August of 2016.  He's only over in China for a few weeks.

1          THE COURT:  Can I stop you there?

2          The defendant's -- I believe it's in the defendant's

3   position paper or maybe it's yours that mentions he had told his

4   parents he was planning to go to Saudi Arabia to visit Mecca?

5          MR. BOSSE:  That's correct.  That's my understanding.

6          THE COURT:  But that's not in the presentence report.

7          MR. BOSSE:  Okay.

8          THE COURT:  So was that a statement made prior to

9   going to Jordan?

10          MR. BOSSE:  I believe it was on his way over there, he

11   called, he called his family and said he wanted to go to Mecca,

12   and then he didn't actually try to go to Mecca, he went straight

13   to Jordan.

14          THE COURT:  Is there any dispute about the fact --

15   since I don't think it's in the presentence report, I don't

16   recall it -- but is there any dispute over that issue?

17          MR. BOSSE:  I don't think there is.  It's been, it's

18   in the -- it's documented, I think, in some interviews.

19          THE COURT:  All right.

20          MR. BOSSE:  Yeah.  And I shouldn't say he went, he

21   flew to another country and then flew to Oman, Jordan, but that

22   was his destination, the Kingdom of Jordan.

23          What his intentions were there is evident from what he

24   was doing before leaving, researching how to join ISIS, what he

25   told a number of law enforcement agency and undercover

1  employees, and frankly what he says in his letter to the Court,

2  which I was in part astonished by.  He was intending to travel

3  to the Islamic State.  He talks about the caliphate or the

4  State, sometimes referred to as Dash.  That is the Islamic

5  State.  That's ISIS.  The self-proclaimed caliphate, I should

6  say.  And he wanted to do that, by his own admission, to do

7  jihad and shahid, which is an Islamic term for martyrdom.  In

8  his own words, he wanted to do something bigger, better and more

9  purposeful to undertake jihad and seek martyrdom and die in the

10  cause of Allah.

11          When he gets there, he looks for a contact that he had

12  in Jordan, and when he can't find that contact, again, by his

13  own admission, he's riding around in cabs asking cab drivers

14  about ISIS and about a different designated foreign terrorist

15  organization, Jabhat Al Nusra, the Al Nusra Front.  It's

16  designated just like ISIS is.  So he misses his contact in

17  Jordan, he's riding around trying to get people's feelings about

18  these groups, the government argues, looking for his entree into

19  Syria, which he admits in his letter he was trying to get across

20  the border into the caliphate.

21          THE COURT:  But in his letter he seems to suggest his

22  idea was that he would teach English by video --

23          MR. BOSSE:  Yes, Your Honor.

24          THE COURT:  -- and not actually fight, but perform

25  other services.  Is that the way you read it?

1        MR. BOSSE:  That's the way I read it, and I had a

2   section on that.  I'll talk about that right now.

3        First of all, that's what he is saying now, now that

4   he is looking at jail time.  That wasn't the kind of thing that

5   he was saying back in 2016 when this is happening when he talked

6   about wanting to be locked and loaded and seeking to do

7   violence.  And as far as his new statements go, a lot of people

8   have this misimpression that if you go over there to ISIS, to

9   the Islamic State and, for example, you render medical aid,

10  you're helping the people who are injured over there in

11  ISIS-controlled territory for ISIS, that you're somehow exempt

12  from the laws of the United States regarding material support

13  for terrorism.  That's not true.  There's a single exemption

14  under the material support law, and that's for providing

15  medical, medical supplies.  Anyone who goes over there to do

16  anything for the Islamic State is materially supporting an FTO

17  and is as liable as anyone who picks up a rifle to do that.  Now

18  that's even assuming under his best-case scenario where he is

19  going over there presumably to teach English -- I don't, I don't

20  think the facts suggest that that's true, that's a statement

21  he's making now two years on as he's facing sentencing for this

22  crime.  But even if the Court believed what he wrote in that

23  letter -- which I'll talk about in more detail, because that

24  letter is bizarre -- even if the Court believed that he's

25  basically saying he's crept right up to the line of saying I was

1   going over to do material support, frankly if we'd had that

2   letter at the time we charged this case this might be a

3   different-looking case than what ended up being charged.  Let me

4   leave it there and then talk a little bit about more of the

5   things he said that, at the time he said them, make clear what I

6   think his intentions were.

7           The statements he's later making leave no question

8   that he plans to travel to ISIS territory.  He said that he went

9   to Jordan rather than through Turkey because he didn't want to

10  be caught like everyone else.  And if the Court will remember,

11  in this 2016 time period there were a number of news stories

12  about foreign fighters crossing the border into Syria in what

13  was at that time a rather porous border between Turkey and

14  Syria, but a number of them were being picked up.  He also

15  talked about watching propaganda videos urging people to come

16  forth to your State, meaning the Islamic State, or Dash, and he

17  expressed frustration that the instructions he was reading about

18  online for how to join the State weren't specific enough.  He's

19  not -- he's not unhappy that he got picked up, he's unhappy that

20  he didn't have more specific instructions to try to get over

21  there.  These are not the actions of someone who is not trying

22  to join a foreign terrorist organization.  That is after he

23  makes these statements to the cab driver asking his opinion on

24  these various FTOs, angling for a way to get into Syria.  So

25  he's picked up by Jordanian authorities, spends a few days in a

1  Jordanian jail, and he's then deported back to the U.S.

2       These are the statements he made on his way back to

3  the U.S. or shortly after.  "I wanted to commit jihad and

4  shah-id."  He had nothing but praise for the terrorist attack in

5  Paris, in Nice and in Orlando.  ISIS, although extreme, is

6  necessary.  He said he wanted to be locked and loaded in this

7  conversation about ISIS, while being extreme is necessary.  And

8  he went to Jordan to do something bigger, better and more

9  purposeful, by which he meant dying in the cause of Allah.  He

10  wanted to do something glorious, he said, and make the cuffar

11  suffer.  And the cuffar is an interesting term.  It's a

12  derogatory term for anyone who is not Muslim.  And there are

13  similar statements of dislike for people who were not Muslim.

14  Similarly he notes he doesn't care what happens to infidels.  He

15  says ISIS members are true Muslims, and he discusses his desire

16  for a war between Muslims and non-Muslims and his desire to join

17  a Muslim Army and get training.  After he's back, after he's

18  back, he goes up near Detroit for a few days.  He actually sang

19  an ISIS fight song to an FBI undercover employee.

20       THE COURT:  Why did he go to Detroit?  What's the

21  evidence on that?

22       MR. BOSSE:  Your Honor, my understanding is that he

23  went to Detroit to seek out --

24       THE COURT:  He lands there or landed here and --

25       MR. BOSSE:  He landed in Chicago and then had a ticket

1   for Detroit.  My understanding is he was trying to get to --

2   there were a couple of towns in the area of Dearborn, Michigan

3   that are heavily Muslim, and that's, he -- for whatever reason,

4   he wanted to get up to those towns.  And he may have also wanted

5   to meet -- there's a cleric up there that he may have been

6   interested in meeting.

7           And he meets, thankfully, an FBI undercover employee

8   who he has this bizarre and incredible, wide-ranging

9   conversation about and sings this ISIS fight song.  That's when

10  he talks about having made an ISIS flag and wanting to replace

11  his neighbor's American flag with an ISIS flag.

12          THE COURT:  Are you able to tell me whether these --

13  are you able to tell me whether these various referenced CHSs

14  were people that sought him out or he was seeking out?  What

15  light can you shed on that?

16          MR. BOSSE:  There's very little I can say about that,

17  Your Honor, about how he came in contact with these people.  I

18  will say that when he landed in Chicago he was interviewed in a

19  room by FBI agents, he was shown their badges, it was a

20  voluntary interview, and then when he knew he was speaking to

21  FBI agents he still made these statements supportive of ISIS.

22          When he got up into the Detroit area, it came about

23  that he had contact with another individual who was an

24  undercover employee when he made even more statements to.  And

25  it's interesting, because he was actually being careful about

1   what he said.  These things sound, on paper, extreme.  But he

2   was being careful.  He asked the undercover up there to turn off

3   his phone so that they wouldn't be monitored.  And he was

4   suspicious of the FBI, and in hindsight rightly so, obviously.

5         The Court should take into consideration as I read

6   these things out that these are statements he's making that in

7   his view are actually somewhat guarded at the time he's making

8   them.  He's careful about what he says.  And you can see that in

9   the letter that he wrote to the Court where he claims he only

10  wanted to go to the Islamic State so he can teach English.

11  Again, teaching English for the Islamic State is material

12  support just as much as doing anything else for that group is.

13  But that's if you accept that representation he's making, this

14  idea he's going to a peaceful part of the Islamic State, that

15  doesn't line up with the things he says beforehand:  Searching

16  for how to join ISIS, complaining about how hard it is to get to

17  the self-proclaimed caliphate.  His comments show his

18  intentions.  For example, suggesting that Allah might bring a

19  disease on the U.S. that will kill all the cuffars.  That's sort

20  of the beginning.

21        Once he gets back here to Virginia, he returns from

22  the Detroit area, I believe flies back to Richmond, and then

23  back to Williamsburg, and goes back to his family.  And you've

24  seen in the paper his claim about how important it was to get

25  back to his family back in sort of arms of the supportive family

1  support structure he had, which by all accounts is an incredibly

2  close and tight-knit and supportive family, but it's after he's

3  back with his family that he's talking about wanting to blend in

4  and do something glorious -- or around the time anyway -- and we

5  have his letter now where he tries to explain away what he's

6  saying.

7            THE COURT:  When you say "around the time", but

8  there's no doubt these are statements made after his return from

9  Jordan?

10           MR. BOSSE:  Yes, sir.  These are after his return from

11 Jordan, and now we're moving into September 2016.  So now we're

12 a month and a half back from being in Jordan, and this is after

13 he's back at his parents' house for several weeks before he

14 makes his applications to the military, and he's discussing with

15 the confidential human source by text about what kinds of

16 attacks are justified and what kinds are not justified.  And the

17 one thing that he's crystal clear about in his messages is that

18 attacks on U.S. military service members are justified.

19 Completely justified in my eyes, is how he describes the Nidal

20 Hasan attack.  100 percent justified.  "May Allah curse the soul

21 of those two."  Now, I know the Court knows, but just for the

22 oral record here, Nidal Hasan was a major in the U.S. Army who

23 murdered 13 service members on November 5th, 2009 on base at

24 Fort Hood, a base he accessed by virtue of being in the

25 military.  And I think he shot over 30 other service members in

1   the attack.

2         That's the one thing -- because Mr. Patel has some

3   quibbles and qualms about, you know, at least expresses some

4   quibbles and qualms about certain of these other attacks.  There

5   was a stabbing that he had some qualms about.  Didn't have any

6   qualms about the Paris nightclub shooting.  He expresses

7   complete and utter support for the Nidal Hasan attack.  That's

8   just a few weeks before he applies to join the U.S. Army, the

9   most serious domestic attack on military service members in

10  recent years.

11        Now we get to the Army application.  He lies on the

12  national security portion of the application form.  Lies about

13  his previous foreign travel.  Says he went on a family trip to

14  India and leaves out the China and the Jordan trips.  And then

15  when he's asked to bring in his passport to confirm the foreign

16  travel, he takes further steps to continue to hide the one thing

17  he's trying to hide, which is that this is who he is, he's

18  trying to hide from the Army who he is by obscuring his prior

19  foreign travel, which is the thread that, once you pull it, gets

20  the -- you know, the FBI's interviewed him by this point, and

21  there's an interview on file with the FBI where he's talking

22  about his support for ISIS.  And so this is the thing he's

23  trying to hide.  And he actually takes a further step of telling

24  the State Department he lost his passport and needs a new one.

25  The prior passport has a special stamp you get when you're

1   deported from a foreign country back to the U.S.  The passport

2   is no longer good for travel, it's only good for return travel

3   to the U.S.  The old passport would have made clear he traveled

4   to China and Jordan and been deported from Jordan, which is, if

5   you're an Army recruiter, the single thing you care most about:

6   Is this person actually harboring not just anti-American or

7   antimilitary sentiments, but pro terroristic sentiments, which

8   was imminently the case here.  He knowingly commits a federal

9   crime to try to get into the Army.  He was told and the form

10  itself says if you lie on this form, 1001.  He was specifically

11  told that.  He knowingly committed a federal crime to try to get

12  in the Army.  And then when he realizes that he's got to back it

13  up, he knowingly commits a second federal crime to try to get a

14  new passport to cover for the first lie.  This wasn't a fluke.

15          He then applies to the Air Force and does the same

16  thing on his national security questionnaire.  He is applying

17  for other jobs.  He's applying to police departments, probation

18  offices.  He's applying to a number of jobs in the area, many of

19  which involve having a gun.

20          THE COURT:  So these SF-86s he submitted to the Air

21  Force deleted the same information, deleted or --

22          MR. BOSSE:  Yes, sir.

23          THE COURT:  -- not listed for the Army?

24          MR. BOSSE:  Exactly the same information.  I think

25  they're basically mirror images.

1     THE COURT:  The big question, or one of the big

2  questions here in my mind is the inferences to be drawn from

3  these things.  In his letter he says that -- I believe he says

4  that about the same time -- let me find it, because this is

5  important.  He says "It was brought to my attention that I

6  provided false information about my travel history, like lying

7  about my passport.  I lied not with malicious intent, but to

8  speed up the process.  I have proof of this too.  While I was

9  busy applying for jobs, I applied to a few CIA positions online

10 and disclosed my full," underlined, "travel history, and even my

11 religious history.  I figured my crazy life may be of value to

12 the CIA.  That's why I applied.  Why would I lie on one

13 application and be honest on another?  I figured the Army

14 wouldn't waste their time conducting a full background check

15 unless it was for a sensitive position.  Obviously the CIA would

16 investigate me inside and out, so I disclosed absolutely

17 everything there."

18     So do you have anything you're able to share with me

19 that would corroborate or not corroborate that, and if so,

20 either way, what does that do for the inferences you and the

21 defendant are asking me to draw?

22     MR. BOSSE:  It does -- that is the first that I heard

23 of it, Your Honor, was in that letter.  We had no information

24 about that.  I've seen no evidence of that, that he applied to

25 the CIA and disclosed his full travel history.  I think either

1  way you take it, I don't think it helps him in the least.

2          And one thing we have to think about as we look at

3  that letter is this is two years on.  He's looking at a

4  significant federal sentence, and this is him trying to thread

5  the needle to explain what he was doing over there in a way that

6  doesn't make it worse for him.  And on its face the letter is

7  just, it's extraordinary.  Parts of it are just unbelievable.

8  I'll get to parts of the letter briefly, but I'll talk about the

9  CIA part now.

10          The one thing we know are the things that he said back

11 in 2016.  Those are on the record and we know he said them.

12 This is someone who talked about loving ISIS, talked about doing

13 violence, praised violent terrorist attacks and praised in

14 particular an attack, the one that he singled out for praise was

15 this attack by an Army major on his own fellow service members.

16 Weeks later, weeks later he's applying to the Army.  And this

17 idea that, well, I didn't disclose everything to the Army

18 because I was trying to speed the process, he was told that it

19 was a federal crime to lie on that form, and he did it on

20 purpose.

21          THE COURT:  How many weeks later?

22          MR. BOSSE:  I think three, three and a half weeks

23 later.  Something in the ballpark of that.  Between these

24 statements.

25          And Your Honor, here's the -- thinking about this

1   claim about the CIA, let's imagine he just lied on the form and

2   done something else.  He could have withdrawn his application,

3   you know.  He could have backed away at that point.  But he

4   doesn't.  When he realizes that he's got to turn in a passport

5   to verify his foreign travel, he files a fraudulent passport

6   application.  And I think that's what -- it's the two-step

7   nature.  These things didn't happen all in an hour.  He had time

8   to consider what he was doing, and he doubled down on the lie he

9   made to the Army.  The light -- when you put that in context

10  with the statements he's making, the light that this casts on

11  this idea -- he's also applying to the CIA -- it's just, if he

12  did, it's incredible and it doesn't make sense.

13          THE COURT:  So you're saying that if in fact his

14  purpose was to speed up the process and thinking that by making

15  the misrepresentation to the Armed Forces and thinking that they

16  wouldn't conduct the kind of full background check, that the CIA

17  would -- assuming what he says is true -- you're saying that the

18  inference or the statement he makes is belied by the fact that

19  he was necessarily delaying the process by having to seek a new

20  passport and go through that whole process for his applications

21  to the Army and Air Force to be fully processed.  So it

22  undercuts his assertion for the reason that he did not list his

23  travel information on those applications versus his assertion he

24  did on the CIA application?

25          MR. BOSSE:  I think I'm making an even broader

1  argument, Your Honor, which is that --

2          THE COURT:  Do you agree with what I said, if you're

3  making a different argument?  Does it undercut his assertion?

4          MR. BOSSE:  It does undercut the assertion.  The idea

5  that you're going to speed up the process by submitting a new

6  passport claim does undercut that assertion, certainly.

7          My broader argument is what's in that letter doesn't

8  make sense.  It's internally inconsistent, and it's inconsistent

9  with the things we know he said before he had time to think

10  about the situation that he was in.  It's completely

11  inconsistent with the things he's saying back in 2016 when he's

12  full of praise for this foreign terrorist organization and

13  praising attacks on military service members and then trying to

14  join the military.

15          The idea that was -- let's say it's true.  I mean,

16  let's say that he's more naive than I think he is.  He's a

17  college-educated man.  Let's say he's also trying to join the

18  CIA.  In my mind, putting aside the idea of whether he lied on

19  that application or not, that's even more troubling.  This is

20  someone who to this day talks about, equates American foreign

21  policy, including the things that are going on overseas, to

22  terroristic actions.  That's on the last page of the letter he

23  sent.  The idea that we should be happy or that it somehow helps

24  him he was also applying to join the Central Intelligence Agency

25  is astounding to me.  It's worse, Your Honor.  It's not better.

1   And whatever it does for his *mens rea* for the crime that he did

2   commit that he is charged with here today, which he's already

3   been found guilty of, I think it's irrelevant.  My real concern

4   was that he was also trying to join the CIA.

5           Let me pick up a little bit because I want to talk a

6   little bit about parts of the letter.

7           He's claiming in the letter that he was delusional and

8   psychotic when these things happened.  There is absolutely no

9   evidence whatsoever of that.  Even if he had been in some kind

10  of state at the time that he's flying back from Jordan and

11  getting back here and going through a long and very lucid and

12  cogent interview with FBI agents, the statements he's making

13  about ISIS and Nidal Hasan, they continue after he's back, and

14  they continue on for some time.  After he's back with his

15  family, back in Williamsburg when he claims that things

16  normalized again.  He says "Now that ISIS was out of the

17  question."  But then he also admits that he was trying to join

18  the so-called caliphate.  The so-called caliphate was proclaimed

19  by ISIS.  The statements in that letter, he's trying to walk a

20  very fine line having to do with avoiding saying more things in

21  material support of an FTO, and I think he actually gets right

22  up to it and maybe across over it.  People who don't want to

23  join ISIS don't say -- well, let me put it this way:  When he's

24  over in Jordan, when he's in Jordan, at that time he's certainly

25  not saying ISIS is out of the question.  He is seeking out the

1  group.  By his own admission, that's how he's trying to find out

2  and get across to Syria, by asking people about ISIS and the Al

3  Nusra Front.  He admits he was trying to get a ISIS territory,

4  and he tries to draw this distinction, "I believe in the

5  caliphate, but not ISIS-led caliphate.  I envision a noble

6  uprising within the ranks of ISIS."

7          THE COURT:  I'd like to, this is important --

8          MR. BOSSE:  Yes, sir.

9          THE COURT:  And this is important because you are

10  asking me for a sentence that is based upon an assertion that

11  the enhancement, the terrorism enhancement must not apply, but

12  it comes close enough that you think it's justified for me to

13  vary way up?

14          MR. BOSSE:  Yes, sir.  That's right.

15          THE COURT:  He says "After leaving China and while on

16  the plane to Beijing, I decided to see if the so-called

17  caliphate was legitimate.  On propaganda videos it was

18  illustrated as an Islamic Utopian society.  The behavioral

19  experts who were behind the videos emotionally blackmailed us by

20  convincing us, the young and impressionable, that we would go to

21  hell if we stayed home.  From what I read online, it would not

22  be illegal to venture into ISIS territory, it would only be

23  illegal to fight for ISIS.  I didn't agree with the methods of

24  aggression that ISIS was using, so ISIS was completely out of

25  the question.  Propaganda videos online expressed a call for all

1  Muslims to fight in Syria to defend the honor of innocent Sunni

2  women being raped by Basher Al Assad's Shiite Army.  Many videos

3  surfaced of innocent Syrian men, women and children being

4  oppressed, tortured and killed at the hands of the brutal

5  regime.  It was absolutely incumbent for me to do something.  I

6  had absolutely no intent or interest in raping or pillaging

7  anyone.  Nonetheless, I felt disgusted to live in peace and

8  quiet while innocents were dying in a blessed land.  I decided

9  to embark upon the noble path of martyrdom for the sake of the

10 oppressed.  I think if I had ever made it to ISIS territory and

11 ISIS learned of my sincere intention, they would have killed me

12 immediately.  If some of the Western-backed non-terrorism

13 entities like YPG or Ahraar Ash Saam had found me, I would have

14 died a noble death in the way of justice.  I prayed to God to

15 guide me to the good guys.  I figured I would live near or in

16 ISIS territory and learn the local language while I earn a

17 living teaching English over the Internet.  I rationed that as

18 the world came to an end, God would guide me to the true group,

19 and I would earn martyrdom.  I believed in a caliphate, but not

20 the ISIS-led caliphate.  I envisioned a noble uprising with the

21 ranks of ISIS with the subsequent passing of authority to a

22 just, humane non-terrorist authority.  In my grandiose fantasy,

23 I was among the brave, noble men facilitating this revolution.

24 Of course to this point, had done nothing to advance this

25 fantasy."

1          So were you saying that you think this statement is

2     evidence of an intention to provide support to an FTO?

3          MR. BOSSE:  Yes.  I'm saying that.  No. 1 I'm saying I

4     don't believe --I don't think -- I think the facts belie that

5     statement.  That is a statement written a couple weeks before

6     his sentencing in a federal case two years after what happened.

7     I don't think in the least that that's what he was really doing

8     there.

9          I'll talk about two scenarios.  One, I'll explain why

10    I don't think that even comes close to what he was doing there,

11    and two, I'll try to explain a bit more about why even if we

12    take him at his word, it's extraordinarily concerning.

13         The first thing, ISIS is completely out of the

14    question is what he says now when he's facing sentencing.  His

15    searches when he was here in the U.S. were for, I think it was

16    just a search "how to join ISIS."  He's over there and he's

17    seeking out people.  When he can't find his contact there, he's

18    seeking out ISIS and he's seeking out the Al Nusra Front and

19    he's trying to cross over into the State, with a capital S.  The

20    State means ISIS.  The State means the self-proclaimed caliphate

21    by Al Bagdhadi, who was the leader of ISIS, who proclaimed the

22    supposed caliphate over there.  That's where he's trying to go.

23         And as far as his peaceful intentions, when he's back

24    here, even after he's back here, even after he's been debriefed

25    by the FBI, even during his debrief with the FBI, his praise is

1  for violent ISIS attacks.  His praise is for the Paris attack.

2  His praise is for the Orlando attack.  And his praise -- he was

3  into it.  And his praise then later, weeks later, was for the

4  Nidal Hasan attack.

5      These things that he's saying in his letter, when you

6  line them up with what he know he said in 2016 before he knew

7  that he was facing the situation he's facing now, they do not

8  make any sense when you line them up together.  But let's say

9  that he was actually trying to cross over to the State, to the

10 caliphate, because he wanted to teach English.  I don't, I don't

11 buy that for a second.  But if that is the case, he is

12 expressing his desire to provide material support to a

13 designated FTO.  Teaching English for ISIS is material support

14 to ISIS by the provisioning of yourself, is the way it works

15 under the statute.

16      THE COURT:  Well, he doesn't exactly say I was going

17 to teach English to ISIS, he just says teach English.

18      MR. BOSSE:  Yes, Your Honor.  And again, these are the

19 kinds of fine distinctions that he's able to make two years on.

20 There was certainly no question in his mind based on the things

21 he said at the time, he said them in the summer and fall of

22 2016, what he wanted to do.  He was full of praise for ISIS and

23 he tried to go over and cross the border in Jordan into Syria.

24 And the reason he was trying to do that was to get to "your

25 State."  Your State.  He talking about the propaganda videos,

1   "Come to your State."  That's not a reference to some other

2   sub-nationality, that is a reference to the Islamic State.  It's

3   a reference to ISIS.  That's what he was trying to do.  That's

4   what he was trying to accomplish.  And frankly, he's just lucky

5   he got picked up by the Jordanians when he did, because he was

6   brought back here and didn't end up crossing the border, and

7   here we are.  Really, when you think about it, in the long run,

8   all to his good.  Obviously no one wants to be sitting where

9   he's sitting today, but he's alive here in America and not dead

10  over in Syria.

11          Let me pick up on my notes, Your Honor.  I had a few

12  other things, but I've probably talking enough for the Court, or

13  close to it.

14          The other idea in the letter, and this is just getting

15  into this letter and the things he's saying, is that his mind

16  returns to normal when he's back home.  If we take him at his

17  word that that's true, then his statements of support for the

18  Hasan attack were after his mind had returned to normal.  And

19  then his application to join the Army a few weeks later are also

20  after his mind's returned to normal.  Again, someone who's

21  equating American government action to terrorism, trying to join

22  the U.S. Army.  Those two things do not go together.  Even today

23  in the third-to-last paragraph in the letter, the equations he's

24  making there do not line up with someone who wants to join the

25  Army or the Air Force or the CIA or any other government branch

1   for the reasons we want people to join and do government

2   service.   The exact opposite is true.

3           We have two narratives here, and in Mr. Patel's he's

4   sort of misguided and naive and also supposedly psychotic.

5   Again, there's no evidence whatsoever of that.  And his

6   narrative, the timing of his statements and the timing of his

7   application to join the military of a nation whose military

8   actions he abhors, that's all just a coincidence, and he's just

9   a peace-loving person who wanted to see what life in ISIS

10  territory was like and then come back and join the U.S. Army.

11  Those things, those things don't go together, Your Honor.

12          We have to look at the evidence that we had at the

13  time, the statements he made at the time, and weigh what he's

14  saying now two years on when he knows the situation he's in

15  against the things we know he said at the time that matters.

16  He's talking about wanting to join a Muslim army and get

17  training and looking forward to the prophesied war between

18  Muslims and non-Muslims.

19          THE COURT:  So the defense paper, the defense position

20  paper references numerous pages 2 through 5.

21          MR. BOSSE:  Yes.

22          THE COURT:  Numerous statements made to confidential

23  human sources that, some of which are not in the presentence

24  report.

25          MR. BOSSE:  That's right.  They're accurate as far as

1    I know.  I reviewed those relatively closely.

2         THE COURT:  The suggestion being that these statements

3    contradict the statements you're citing regarding support for

4    ISIS.

5         MR. BOSSE:  That is the suggestion, Your Honor.  The

6    statements that are cited in the defense paper are mostly made

7    after, including into 2017, after the Army application, after --

8    I think most of them are maybe after the Air Force application.

9    The defendant was suspicious of the CHS who he was dealing with,

10   and you know, at some point he starts saying things about I'm no

11   longer a Muslim, I've lost my faith in Islam and I don't believe

12   in the things that ISIS is doing.  A striking departure from his

13   full-throated belief in the things that ISIS was doing at the

14   time of the events in question in this case, which is the

15   relevant conduct that I'm talking about.  Did he later

16   disassociate from ISIS in his mind?  I don't know.  He might

17   have.  He might not have.  What his state of mind is now, I have

18   no idea.  That letter that he wrote isn't full of encouraging

19   things, I don't think.  I'm -- I think I'm more worried after

20   reading that than I was before when I lined it up with what he

21   was saying at the time in question with the things we know he

22   said and thought and did.

23        But certainly he did make statements in the late 2016

24   into the mid of 2017 that, well, I don't really believe in that

25   stuff anymore.

1          There is an intelligence note that Mr. Clancy's going

2   to describe that talks through those statements and the

3   intelligence note surmises that he's questioning his Islamic

4   faith and extremist ideology and is focused on finding

5   employment.  I didn't write this note, and it's written by an

6   intelligence analyst at the FBI.  I don't give it a whole lot of

7   credence.  It does say as far as the -- I should say, I should

8   couch that -- as far as what his state of mind was in the 2016

9   time period that we're talking about here.  It does, it does

10  suggest that he may be disassociating, and also goes through an

11  analysis of alternates; that he's trying to go undercover and

12  seek to get this training that he's getting, try to hide his

13  extremist ideology.  It also says if that he doesn't get the

14  employment he's looking for, he may revert to extremism.

15          One thing I wanted to say about the claim that he was

16  psychotic, it -- again, we go down two roads.  One is I don't

17  believe it.  Two is, if we take him at his word and he's not

18  medicated anymore, if he was indeed psychotic and if his

19  psychosis is slipping into ISIS/Islamist extremism, then we have

20  every concern, we have every right to be concerned that that's

21  going to happen again.  I mean, both of the roads that he goes

22  down in this letter, neither ends up in a good place, and all of

23  them support protection of the public rationale.

24          THE COURT:  So he gets a degree from Virginia State

25  University?

1           MR. BOSSE:  Yes.

2           THE COURT:  4.0, maybe?

3           MR. BOSSE:  That was true at VSU, Your Honor, not at

4  other places.

5           THE COURT:  In criminal justice?

6           MR. BOSSE:  Yes, sir.

7           THE COURT:  2014-ish.  He has an internship at the

8  Petersburg Police Department?

9           MR. BOSSE:  That's right.

10          THE COURT:  So he has interest in criminal justice, at

11  least.  We know that.

12          MR. BOSSE:  Yes.

13          THE COURT:  And he says he applied for jobs and

14  couldn't get them, and worked at the family motel, and then he

15  goes off to China?

16          MR. BOSSE:  That's right.  That's correct.  I don't

17  know the details of the pre-summer 2016 job applications.  He

18  was certainly applying when he came back here along with the

19  other places he was applying to.  But I think that's right.  I

20  think Your Honor summarized it correctly.

21          THE COURT:  And when he was applying to the military

22  was he also applying for criminal justice jobs?

23          MR. BOSSE:  He had a number of applications out to a

24  bunch of police departments, and I think a handful of probation

25  departments also.

1          THE COURT:  And he didn't have to list his foreign

2   travel for those?

3          MR. BOSSE:  He did not.  He did not.  That's right.

4          THE COURT:  All right.

5          MR. BOSSE:  As to employment, Your Honor, he has a

6   great family by all accounts.  Everyone whose dealt with his

7   family has nothing but praise for it.  Close-knit.  He had a job

8   there.  A job he could do.  And it was a guaranteed job, and by

9   all accounts from the letters, he was good at it.  And, again,

10  that's the context where we look at he's trying to move on to

11  something else and what he's trying to move on to is the

12  military, and he's doing it after these unbelievably frightening

13  things that he's saying, including the praise of the -- if

14  you're going to apply to the military, the Hasan attack, it was

15  devastating to the Army.  It was its own -- it was a major in

16  the Army who did it.  And the idea that this is all a

17  coincidence, it, it... it belies explanation.

18          THE COURT:  He made a distinction at some point

19  between terrorist attacks on civilians and terrorist attacks on

20  military.

21          MR. BOSSE:  That's right.  That's right.

22          THE COURT:  So if we --

23          MR. BOSSE:  I'll --

24          THE COURT:  -- give credence to that distinction, then

25  if he had the change of mind that he asserts in his position

1  paper, it's a switch from someone justifying attacks on the

2  military and drawing the distinction between the civilian

3  population and military population as targets for terroristic

4  attacks, and then a complete turn, 180 degrees, to wanting to be

5  a part of the military within a matter of weeks?

6          MR. BOSSE:  Weeks.  Within a matter of weeks.

7          And briefly, I know I've probably run over whatever

8  allotted time I had, but as far as the attacks on civilians go,

9  when he comes back from Jordan he's praising the indiscriminate

10  killing of civilians by ISIS.  That thinking, if you believe his

11  texts, as it gets, as time goes on, he starts to question that.

12  And there is a -- within Islam, I don't claim to be an expert,

13  there are theological issues with the indiscriminate nature of

14  some terror attacks because some of the people you might be

15  attacking for all you know could be Muslim, could be otherwise

16  subject to conversion.  There's all these -- there are all these

17  theological constructs built around attacks.  And again, even if

18  you accept that, the one thing he was clear about is that

19  attacks on the military are fine.

20          And I'll probably leave it at that, Your Honor.  I

21  think that's probably enough for now.

22          THE COURT:  Well, you're not getting away that easily,

23  because I have some more questions --

24          MR. BOSSE:  Yes, sir.  Oh, yes, sir.

25          THE COURT:  -- for you.

1          Again, you are saying that the Court should not

2   apply -- you have not asked me to apply the terrorism

3   enhancement --

4          MR. BOSSE:  I haven't.

5          THE COURT:  -- in this case.

6          MR. BOSSE:  I haven't, Your Honor.  You know, I didn't

7   have his letter in hand when I wrote this paper.  I think he's,

8   I think he's right, skating along the edge under the fact that

9   relevant conduct includes a federal crime of terrorism, because

10  I think he's almost admitted -- very careful with his words, but

11  he's almost admitted material support.  But I'm going to stand

12  by the paper I wrote.  I did not seek it, and I don't seek it at

13  this time.  I seek only a variance.

14         THE COURT:  Okay.  So you essentially say that because

15  this is close but doesn't meet the enhancement requirements

16  sufficient for you to seek it, the Court should still consider

17  the context here, and even though the Court might not be able to

18  conclude by a preponderance of the evidence that those

19  enhancement criteria are met, the Court should nonetheless vary

20  from, what is it, eight to 11 months?

21         MR. BOSSE:  Eight to 14 months.

22         THE COURT:  14 months --

23         MR. BOSSE:  Yes, sir.

24         THE COURT:  -- the current guideline range, up to 96

25  months?

1        MR. BOSSE:  96 months, Your Honor.  Eight years.

2   That's the government's request.

3        THE COURT:  Okay.  So you cite in your position paper

4   a case that suggests that -- just an observer of this might say,

5   wait a second, the government is asking the Court to punish

6   someone for their thoughts.  And you cite a case that addresses

7   that, don't you?

8        MR. BOSSE:  Well, I don't, I don't -- I'm not asking

9   the Court to punish Mr. Patel for his thoughts.  But we did cite

10  a case about the expressions that people make that may otherwise

11  be subject to First Amendment protections can certainly be

12  weighed in the balance when you're analyzing the relevant

13  conduct; not just the *res gestae* of the crime, but the relevant

14  conduct of the crime, including part of the materiality

15  analysis, yes.

16       THE COURT:  Okay.  So you're essentially asking me to

17  focus on the intended outcome of the unlawful acts here; that

18  is, what the activity was calculated to accomplish, and not so

19  much what his claimed motivation behind it was?

20       MR. BOSSE:  I think that's right, Your Honor, as far

21  as the enhancement.  We were talking about the enhancement in

22  part to show that he's on the razor's edge from a guidelines

23  range that is, I believe it would be restricted at -- it would

24  be restricted at the statutory maximum, and he's on the razor's

25  edge with that.  And that's just one of the factors that shows

1  that this is not a typical 1001/1542 case.  The reason I'm

2  asking for a variance in this case has to do with his conduct

3  and his relevant conduct to the case and all the 3553(a)

4  factors.  I'm not saying, well, the enhancement almost applies

5  so you should meet it somewhere in the middle.  That's not what

6  I'm saying.  I'm saying that the fact that the enhancement

7  almost applied shows how serious the conduct is.  And we're not

8  asking for the enhancement.  What I'm saying is considering the

9  relevant conduct, considering what he did and what, and what he

10  did before, the lies that he told the Army and the Air Force,

11  the travel over to attempt to go to the Islamic State, that all

12  has to be considered.  And we do the same 3553(a) factor

13  analysis we normally do, and here, protection of the public and

14  deterrence weigh strongly in the government's mind, and that

15  considering all these things, then an upward variance, a

16  significant upward variance is appropriate.  That's the

17  government's argument.

18        THE COURT:  Okay.  So notwithstanding the fact that

19  you believe the evidence here does not merit the terrorism

20  enhancement, your position is that this Court can look to the

21  intended purpose these two criminal acts to which he's pled

22  guilty, and look to the evidence before it regarding the trip to

23  Jordan, the statements, the ISIS focused activity, and conclude,

24  therefore, that when the 3553(a) factors are applied to the two

25  crimes to which he pled guilty that the sentence that is

1   appropriate; that is, sufficient to accomplish all the purposes

2   of sentencing but not greater than necessary to do so, is this

3   96-month sentence, and further that that sentence is appropriate

4   because the purpose -- because this Court can conclude that the

5   purpose for doing these two acts was very different than the

6   mine-run guideline case?

7           MR. BOSSE:  Yes.  And --

8           THE COURT:  So.

9           MR. BOSSE:  Sorry.

10          THE COURT:  So if that's the case, tell me, do I have

11  to -- do you believe I have to conclude by a preponderance of

12  the evidence what the purpose was for doing these things?  And

13  if I can say that by a preponderance of the evidence here the

14  purpose was to facilitate these terrorism kind of activities,

15  then why wouldn't -- why would that be different than your

16  conclusion that you can't get to the terrorism enhancement?

17          MR. BOSSE:  Let me take -- there's a lot there, Your

18  Honor.  Let me try to take it a step at a time.  I'm trying to

19  make notes as you were putting the hypothetical to me.

20          I think there's two things that the Court can do here.

21  We're talking about the crimes of conviction and we're talking

22  about the relevant conduct of those crimes of conviction.  And

23  when I'm asking for a variance I'm thinking not -- I'm thinking

24  of the relevant conduct running in two directions.  I'm thinking

25  of the relevant conduct running backwards from the time of the

1  crimes and looking at what Mr. Patel was trying to cover up.

2  What he was trying to cover up was that he went over and tried

3  to go to ISIS.  So that's the backward-looking relevant conduct.

4  And that, I think, if there were a preponderance -- if the Court

5  had to make any findings by a preponderance, I think that's

6  relatively easily done based on what's the in record.

7          The other --

8          THE COURT:  On the backward-looking conduct?

9          MR. BOSSE:  Yes, sir.

10         THE COURT:  Okay.

11         MR. BOSSE:  The other portion I'm looking at is

12  thinking about the lies that he told to try to join the

13  military.  There is a forward-looking aspect to this case.  It

14  falls under the aegis of relevant conduct, and that is this is

15  someone who is supporting service members being killed by their

16  own fellow service members who is then immediately -- and who

17  has this affinity, a stated affinity at the time, of ISIS and

18  actually took a step of going to Jordan, which is an incredible

19  step.  And when we have the *mens rea* locked here, Your Honor.

20  In a domestic case like this, the person is normally arrested at

21  the airport.  Then don't actually make it over to Jordan or far

22  less, Syria.  So that's the person we're dealing with who is

23  lying to the Army.  And it begs the question:  What is he lying

24  for?  And the government's view is that he was lying because he

25  wanted to join the Army and get the kind of training and

1   firearms experience that the Army affords, and possibly carry

2   out the same kind of attack that he'd espoused and validated and

3   said was completely justified.  Why else is someone trying to

4   join the United States Army?  Whether the Court could make that

5   kind of forward-looking finding by a preponderance of the

6   evidence, I don't know.  I think, I think that's what happened

7   and I think that's the only rational explanation, when you put

8   all the facts together, that's the only rational explanation for

9   what happened.

10          As far as what his forward-looking intent was, whether

11   that is a finding that would -- I'm not sure the Court would

12   have to make a finding by a preponderance that would -- make a

13   finding about for certain what his future intent was.  The

14   problem is that someone who is an ISIS supporter and sympathizer

15   is trying to lie his way into the Army.  And so I guess to the

16   extent there's any question about findings that have to be made,

17   I would point to what it is he's trying to obstruct, which is

18   the relevant conduct that made the misstatement material.

19          And the fact he's trying to lie his way into the Army

20   after praising an attack by another Army service member on his

21   fellow service members, goes into the 3553(a) factors as one

22   factor among many that the Court has to consider.  This is

23   someone who has evinced the kind of future dangerousness that

24   the Court takes into account when it looks at the need to

25   protect the public and specific deterrence.

```
 1              THE COURT:  Okay.  Thank you, Mr. Bosse.

 2              MR. BOSSE:  Thank you, Your Honor.

 3              MR. CLANCY:  Judge, you had asked, when the statement

 4  was made by Mr. Patel about making the distinction between

 5  unsure about targeting civilians and then praising, and I'm not

 6  as deft at pronunciation as my friend Mr. Bosse, but that was on

 7  September 23, September 24 to the CHS.  The statement was made

 8  he's unsure about -- this was turned over to me in discovery --

 9  "Patel states he is unsure about targeting civilians, but

10  believes that adult male combatants can be targeted."  And then

11  he goes on to say, "States that the only attack he feels was

12  truly justified was the Fort Knox attacks."  That references the

13  2009 attack.

14              So that was September 23, September 24.

15              Judge, it's very clear to me that you have grasped, as

16  I knew you would, because you always do, perhaps far more than

17  counsel, the concerns here.  I have attempted to set forth in my

18  position paper, kind of contrary to what the government

19  predictably put in their position paper, the events leading up

20  to China and to Jordan, to being arrested, to being transported

21  to Chicago, to Detroit and then to home are set forth in the

22  government's position paper.  What I attempted to set forth for

23  the Court's consideration is the part two of the story, if you

24  will, and that is the government had kept a CHS in close

25  contact, and understandably so, upon Mr. Patel's return to
```

1 | Williamsburg.  And we all agree that when he returned in early
2 | September 2016, after his return he maintained regular
3 | communications with this CHS, this contact.  And those have been
4 | turned over in discovery and they have been highlighted by the
5 | government's position paper.  And what I attempted to provide
6 | that, beginning October 31, 2016, Mr. Patel, his tenor and his
7 | comments and his thoughts and his indeed, perhaps even his
8 | beliefs, were changing perhaps even to 180 degrees.  And those
9 | begin October 31, 2016.  And I appreciate my friend Mr. Bosse
10 | confirming that we summarized even with grammatical errors and
11 | words missing accurately what he's transmissions and
12 | communications were between the CHS and Mr. Patel.  And those
13 | continued.
14 | The operative date he makes the phone call to the
15 | United States Army on November 30th, 2016, that's borne out in
16 | the presentence report, I believe, and the statement of facts.
17 | He actually meets with the United States Army recruiter on
18 | December 13th, 2016.  Two days later, makes application for
19 | the -- makes a fraudulent application for a replacement U.S.
20 | passport and on January 30th, 2017, meets with the Air Force --
21 | or makes a phone call to the Air Force recruiter or meets with
22 | the Air Force recruiter and makes the same offense.  That's the
23 | count that was dismissed, or about to be dismissed.  Mr. Patel
24 | was under a very short leash, if you will.  He was watched very
25 | carefully and monitored by this CHS who, as I said, is working

1   and trying to get, extract as much detail and as much

2   information from Mr. Patel.

3           And I find it interesting to note that finally near

4   the end in early March, 2017, Patel's talking about he just

5   doesn't have, he doesn't -- he's got a lot of thoughts, there's

6   a lot of theories and a lot of good reasons to debunk Islam, and

7   the CHS at the very end of that communication gives Patel a link

8   to a website to answer questions about his religion, and again,

9   that's a very pro-Islamic, pro-ISIS, if you will, website that

10  my client did not go to, did not explore, did not try and

11  reacquaint himself with that text or that ideology.

12          The Defense Exhibit 1 that I provided you, I would

13  highlight a couple of points if I could.  This is the FBI's own

14  assessment of Mr. Patel.  And the first one, the first one is

15  dated March 31, 2017 and it begins -- and I know it's completely

16  redacted, but I trust my friend Mr. Bosse, I know that these are

17  the important conclusions, "It's likely Patel is appearing to

18  disassociate himself from any effort supporting or advocating

19  the overthrow of the U.S. government."  That's the FBI own

20  intel.

21          THE COURT:  What page?

22          MR. CLANCY:  On the very first page, the very first

23  paragraph that's not underlined or not redacted.  And we had,

24  "We make this assessment" and he makes that assessment.  They

25  say, "with medium confidence."  They're going to tell us what

1   that means in just a few minutes.  And they talk about Patel at

2   the very bottom of this page how he had been a recent convert to

3   Islam, he had some mental health issues, and obviously they have

4   a myriad of reasons to be watching him, and had been watching

5   him very carefully from the beginning of September 2016 through,

6   now, March of 2017.

7          You go to the second page.  As of March, 2017, the FBI

8   assesses that it is likely Patel was no longer claiming be to a

9   Muslim and was questioning his Islamic faith and beliefs.  This

10  switch is in drastic contrast to previous behavior of Patel's

11  support for ISIS and the Muslim faith."

12         Then, Judge, I would invite the Court to review some

13  of the corroborative details of why the FBI came to that

14  conclusion.  And I'm not going to read them, they're set out

15  there for the Court's consideration.  They are actually provided

16  in more detail than I could provide if my position paper.

17         THE COURT:  And when were the, once again, the

18  applications?

19         MR. CLANCY:  The application to the United States

20  government was made on December 13, 2016.  The Air Force was

21  January 30, 2017.  The passport application was two days after

22  meeting with the United States Army.  That would have been on

23  December 15th, 2016.

24         THE COURT:  What do you say about Mr. Bosse's

25  suggestion that it's appropriate for the Court, notwithstanding

```
1    the fact that the terrorism enhancement doesn't apply -- if the

2    terrorism enhancement applied you would be looking at a

3    guideline range of hundreds of months?

4         MR. CLANCY:  We would be maxed out right now.  We

5    wouldn't be talking --

6         THE COURT:  But his suggestion notwithstanding the

7    fact that the terrorism enhancement is not being sought by the

8    government, not suggested by the probation office, but that it

9    was -- it's arguably a very close call, he says I can still look

10   to the, essentially look to the purpose behind the false

11   application to the Army and the false application to the

12   Department of State as of the time that they were done, that

13   those applications were submitted, considering what had happened

14   before to conclude that the purpose was to facilitate or further

15   his activities suggested by his earlier statements.  That's the

16   backward-looking argument.

17        MR. CLANCY:  I understand.  And the forward-looking

18   argument is he's going to -- and the FBI addresses it -- he's

19   going to, I guess, melt into the Army or the Air Force or law

20   enforcement and wreak havoc.  So those are the two perspectives

21   I think Mr. Bosse is going with.

22        THE COURT:  And you're kind of focusing here on the

23   forward-looking and debunking the forward-looking and saying

24   even the FBI concluded it was likely that he was stepping back

25   from his Islamic faith -- and not to suggest that just having
```

1   Islamic faith is an issue -- but Islamic faith and the, any

2   terroristic contortions of that faith.

3           MR. CLANCY:  How about terroristic communications of

4   that faith?

5           THE COURT:  Okay.

6           MR. CLANCY:  I would respond, since the Court is

7   certainly, has considered the forward-looking argument in

8   responding to Mr. Bosse's request that you look backwards.

9   Isn't that exactly what the terrorism enhancement does?  As I

10  understand the terrorism enhancement, it applies to any offense

11  that involved or was intended to promote a terrorism crime.  And

12  if it's not applicable *vis-a-vis* the probation department, if

13  that is not being sought by the United States government, then

14  why are we -- respectfully -- why would we argue it?

15          And what I understood between the dialogue between you

16  and Mr. Bosse is, well, if it's close, then maybe I'm allowed to

17  apply it.  And I'm not sure, respectfully, that that's correct.

18  I think a variance -- the way I understand variance, and I think

19  the government cited the Gall case and they provided the Gall

20  case, and the Court knows that case better than I, the Gall case

21  talks about the propriety of applying a variance.  In that case,

22  it was a downward departure variance, pretty substantial

23  downward departure variance pretty early post Booker, but they

24  talked about the various -- whether it's upward or downward, it

25  just has to be reasonable.  So I guess the inquiry, Judge, would

1  be is it reasonable to apply the terrorism enhancement in fact

2  even though at law we're not?

3          THE COURT:  Well, you wouldn't be -- would you really

4  be applying it in fact because you're not taking him to 360

5  months or whatever that point is if you find that his -- if the

6  Court finds that his purposes in making these false applications

7  was because he wanted to in some way further his previously

8  stated views?

9          MR. CLANCY:  I agree.  And that would be prospective

10  only.  Not going backwards.

11          THE COURT:  Well --

12          MR. CLANCY:  That's why --

13          THE COURT:  It looks at the purpose -- yes, but it's

14  different.  It looks at the purpose, his purpose at the time

15  that he made these false statements.  In other words, you could

16  make a false statement on an application to the Army because

17  you, for example, don't want them to find out that you went to

18  some country and engaged in some non-terroristic nefarious

19  activity.  You could make the statement on the passport -- and

20  you could make the statement because you wanted it to move

21  faster.  You wanted to be able to get into the Army right away.

22  It's still a false statement.  That's very different than making

23  the statement in the context of all -- making these two false

24  statements in the context of all his prior statements about

25  support for terrorist activities and views and martyrdom and --

1    so that's -- is that not a distinction?

2           MR. CLANCY:  Yes.  But I -- are you going forward?

3    Are you adopting the, we'll call it the Bosse forward argument?

4    Because the Bosse -- that would be the only way that I think

5    that your analysis could make sense.  In other words, his

6    motivation for these, for making this false statement would

7    somehow align himself or be consistent with some of his previous

8    comments and behavior beginning I guess July/August, 2016.

9           THE COURT:  As of the moment he made the two false

10   statements.

11          MR. CLANCY:  Yes, sir.  And it's my contention that as

12   of the moment he made those two false statements, they may well

13   have been nothing more than an attempt to get into the Army

14   and/or Air Force faster.

15          THE COURT:  The letter that your client has written

16   puts a different spin on this, but it -- it adds information

17   too --

18          MR. CLANCY:  It does.

19          THE COURT:  -- to what the Court has before it in

20   reaching these or analyzing the government's request for an

21   upward variance.

22          MR. CLANCY:  I will say that my client, it was

23   important to my client, as he's been sitting in the jail cell

24   all these months, to figure out where he was, how he got there,

25   and why he got there.  And I think that letter was his attempt.

1   And when clients allocute, when clients want that opportunity,

2   they should have that opportunity.  So you are reading the

3   unvarnished truth as best as he could figure it out as to how he

4   was in this place so many months ago, and where he is now and

5   how his thinking and thought process has evolved.  And I don't

6   doubt that he could be criticized for trying to walk a fine

7   line, but he's trying to figure out why he was in that place and

8   what his thought processes were.

9           THE COURT:  What about this CIA --

10          MR. CLANCY:  Yeah.

11          THE COURT:  -- issue?

12          MR. CLANCY:  He told us about that at the time of this

13  allocution.  I trust if there's any proof of that, the

14  government would have that.  I don't think it was a big secret

15  to -- when he applies to the Williamsburg Police Department

16  which is one of the agencies he applied to, the Suffolk Police

17  Department, while they may not have known about -- certainly

18  don't investigate foreign travel, it wasn't a secret in

19  Williamsburg.

20          THE COURT:  You're saying the government knew about

21  his assertion that he applied to the CIA before he saw this

22  letter?

23          MR. CLANCY:  No.  No.  I'm not saying that at all.

24  I'm saying we cannot -- I can't confirm that.  I don't have

25  access to that.  I can't confirm that.  It's the first --

1  respectfully, that's the first I've heard about it.  And perhaps

2  that's counsel's fault for not discussing that with him.  But I

3  think it's telling about it was no secret that he was returned

4  and under investigation and he knew -- I mean, the FBI came to

5  talk to Mr. and Mrs. Patel, his parents, in September of 2016.

6  They executed a search warrant two separate places:  The hotel

7  and the apartment Mr. Patel had been living in previously, and

8  the family home.  The FBI had maintained contact with Mr. and

9  Mrs. Patel.  So there was no secret that he was, that they

10  were -- he was being watched at least at the very beginning.

11  And he's trying, even then -- and I think that's borne out in

12  the government's paper about his -- and in the presentence

13  report trying to find law enforcement jobs, as menial as they

14  may be.  There's a discussion somewhere about wanting to find a

15  job as a 911 dispatcher.  He can type 70 words a minute and

16  still couldn't get that job.  And that would be consistent with

17  what he tried to do in 2014 with Ms. McKenzie from the

18  Petersburg Police Department.  That's one of the letters that

19  you have.

20         So I guess I just want to emphasize to the Court, and

21  since I couldn't and didn't file the FBI, this is the FBI's own

22  position paper, position paper on the dangers and liabilities of

23  Mr. Patel, and I wanted to go through this with you very

24  briefly, Judge.

25         Page 2 of that report just gives more examples, even

1  more than I could file in my position paper, as to why Patel's

2  no longer claiming to be a Muslim.  He was questioning his

3  Islamic faith and beliefs.  The following page says "In February

4  of 2017, claims Islam is not a divine ideology, according to a

5  source."  And it goes on in March of 2017.

6          What's important is that at Page 4 of this report --

7  this is the FBI's own report, and I would direct the Court's

8  attention to the top of Page 4 -- "FBI Norfolk assesses it is

9  likely Patel is seeking employment with federal, state or local

10 government institutions for reasons other than terrorism."

11 That's the government's investigation.  Justice Department,

12 FBI's investigation and conclusions.

13         Then he goes on to explain why they come to that, and

14 I would invite the Court to review those documents.  In fact, he

15 goes on to say in the third dotted paragraph, Judge, "He

16 indicates his interest in being an officer because he, quote,

17 just wanted to work for 25 years, live on the benefits and the

18 retirement," end quote.

19         And then it goes on to say, I do quote this, "The FBI

20 Norfolk's judgment that Patel is leaving behind his Muslim faith

21 and seeking out employment in federal, state on local government

22 institutions is not consistent with" -- something's redacted --

23 "judgments and reporting regarding ISIS-inspired individuals

24 attempting to gain employment with a U.S. government

25 institution."  Again, that's the FBI's analysis.  And they're

1    privy to all the CIPA-protected discovery, some of which we

2    don't even have access to, as evidenced by what's been redacted

3    in Defendant's Exhibit 1.

4              Then it talks about the alternative theories.  First

5    one I think is Bosse's theory.  I'm at Page 6, Judge.  The first

6    paragraph that's not redacted.  That would be Mr. Bosse's

7    theory:  That he wants to get into the military to wreak havoc

8    similar to what he said, communications only, in September of

9    2016.

10             THE COURT:  It looks like the ink is almost gone on

11   mine.

12             MR. CLANCY:  I had to highlight mine so I could read

13   it.

14             THE COURT:  Well, I can't really read some of these

15   words.

16             MR. CLANCY:  Okay, Judge.  Can I --

17             THE COURT:  If there's something you want me to see,

18   you'd better read it.

19             MR. CLANCY:  I'll read it.  It says "FBI Norfolk

20   assesses one alternative is that it is possible Patel's interest

21   in law enforcement and the military is derived from an interest

22   to receive weapons and paramilitary training in order to conduct

23   an attack.  Patel's employment would also allow him to gain

24   tactics, techniques and procedures to cause mass casualties and

25   damage.  Patel would also gain access to both hard and soft

```
 1   targets, and possibly the ability to recruit other like-minded

 2   individuals."

 3            THE COURT:  So that's Alternative No. 1?

 4            MR. CLANCY:  It is.  And since you can't -- do you

 5   want me to keep reading, Judge?  I had to highlight --

 6            THE COURT:  I can read this next paragraph.

 7            MR. CLANCY:  Thank you.  It's similar to Paragraph

 8   No. 1.

 9            THE COURT:  That's about carrying out an attack and

10   hiding his extremist ideology.

11            MR. CLANCY:  Correct.  Then Paragraph 3 I think was

12   touched on by Mr. Bosse in his report or position paper:  This

13   is all a ruse.

14            And then after that analysis, those alternative

15   theories, the FBI Norfolk, the first full paragraph, "FBI

16   Norfolk assess these hypotheses as remote due to" -- we're

17   blacked out -- "Patel indicating no intent to carry out an

18   attack.  Should Patel believe he is under FBI investigation, FBI

19   Norfolk assesses that he would no longer pursue a career with a

20   U.S. government institution and raising his profile back toward

21   his extremist ideology."  So they don't even think the ruse

22   theory holds any water.

23            The final page, Page 9, Judge --

24            THE COURT:  What do you do with "Outlook"?

25            MR. CLANCY:  Well, it's, it's an outlook that says if
```

1   he doesn't get a job, I guess it basically says we need to watch

2   him.  I think I'm paraphrasing that correctly.  They make that

3   assessment based upon "The timeliness of Patel's employment

4   processing and the fact he has almost no chance of obtaining

5   these positions.

6          "Patel may believe his religion and extremist ideology

7   to be a hindrance to his ability to find work.  Continued

8   cooperation with the U.S. military and law enforcement agencies

9   could identify Patel's probable extremist ideological --

10  ideology beliefs," sorry.

11         It's our contention that if you examine what he starts

12  saying on October 31, 2016, he no longer has this ideology.

13         Page 9 of this report, Judge, is just -- they define

14  what it means by Likely or Probable.  I guess this is their own

15  risk assessment.  And Page 10 defines Medium Confidence.  That's

16  the phrase I used when I first began.

17         THE COURT:  Okay.  So if there's something of

18  particular interest you want me to focus on, you need to tell

19  me.

20         MR. CLANCY:  Yes, sir.  Medium Confidence.  Remember

21  the first thing I said to Your Honor?  They felt that -- they

22  say "With medium confidence, Patel is appearing to disassociate

23  himself from any efforts supporting or advocating the overthrow

24  of the U.S. government."  That was the first paragraph of this

25  report.  And they define Medium Confidence at Page 10 as

1   "Generally means the information is credibly sourced and

2   plausible, but not of sufficient quality or corroborated

3   sufficiently to warrant a higher level of confidence.

4   Additional reporting or information sources have the potential

5   to increase the FBI's confidence levels or substantially change

6   analytic judgment."

7        This report was on March 31.  March 31, 2017.  The

8   following report April 7, 2017, is the exact same theory, the

9   exact same conclusion:  That "He's appeared to disassociate

10   himself, and we make this point with medium confidence.  And we

11   make this based upon reporting from collaborative sources with

12   excellent access, law enforcement officers from other law

13   enforcement agencies."  So that's what I meant by prospective.

14   The prospective analysis.

15        Judge, I think when you examine the 3553 factors, I

16   don't think -- and so the only way we can do this, the terrorism

17   enhancement we all concede does not apply, or certainly not

18   being advocated, so there's no finding the Court needs to make

19   by a preponderance of the evidence or otherwise.  So the only

20   issue is whether a variance is reasonable or not under the 3553

21   sentencing factors.

22        The government, I think, and I don't want to speak for

23   Mr. Bosse, but the government will say, well, eight years is

24   sufficient when you consider the 3553 factors, and I would

25   suggest it is patently unreasonable.  I think what sentence is

1   sufficient but not greater than necessary to accomplish the

2   goals of sentencing as set out in 3553(a), the one that the

3   government is zeroing in on is, I have to assume if he's asking

4   you to walk up to the terrorism enhancement but don't cross it,

5   has to be protection of the community from Shivram Patel.

6          THE COURT:  He's also -- No. 1 is nature of the

7   offense, and they have said, you know, this is not a mine-run

8   kind of making false statements case.  So when you look at the

9   nature and circumstances as a whole, I think they're suggesting

10  that supports an upward variance.  And they're suggesting it

11  also bears on the seriousness of the offense; the, as they said,

12  the *res gestae*, the facts that are part and parcel of him making

13  these statements.  And it factors into deterrence.

14         Now, what you have pointed out about the confidence of

15  the FBI with respect to what happened in 2017 and where he was

16  then, changes -- may change the deterrence analysis, but I'm not

17  sure that it undermines the government's argument about things

18  like the nature and circumstances of the offense and the

19  seriousness of the offense at the time it was committed.  And

20  particularly those two.

21         MR. CLANCY:  Yes, sir.  And that probably does zero in

22  on those two.  And would an eight-year sentence be reasonable

23  under the Gall analysis of the variance?  And I would submit it

24  would not.  Now, obviously I've asked you in my position paper

25  for a sentence within the guidelines.  But I understand, I

1    understand your, your difficulty in working through this for the

2    last hour and 40 minutes.

3              THE COURT:  I'm going to let you all have a break

4    before we impose sentence.  But you know, the bottom line is

5    that we have somebody who has not, I guess you might say from a

6    conspiracy standpoint, has not taken an overt act.  We don't

7    have a, arguably an overt act.  You know, had he sent fifty

8    dollars to ISIS, we have a very different case.  Instead, he

9    went to Jordan, telling his parents he was going to Mecca, asked

10   these questions having done all these searches and comes back,

11   makes all these statements, and then within three, three and a

12   half weeks of praising Major Hasan, is filing these

13   applications.

14             MR. CLANCY:  A little more than that, Judge.  About

15   eight weeks.  About eight weeks later he's filing applications.

16   I think I said -- didn't I say September?  September 23,

17   September 24 were the statements involving --

18             THE COURT:  The government said three and a half.

19             MR. BOSSE:  I was wrong with three and a half.  I

20   looked through the papers.  The contact was made with the Army

21   recruiter's office almost exactly five weeks after the statement

22   was made and then he went in later to actually fill out the

23   application.

24             THE COURT:  Okay.

25             MR. BOSSE:  The five instead of three and a half from

1   my perspective.

2          MR. CLANCY:  I agree.  November 30th the call was made

3   to the recruiter, December 13th was the meeting.

4          THE COURT:  That's what we have, and that is the

5   larger picture of the nature and circumstances surrounding the

6   false statements that form the basis of these two crimes.  And

7   although the complete nature and circumstances may not justify

8   the enhancement, it doesn't mean I can't look to those, the

9   nature and circumstances.  I may not be able to -- I may not

10  conclude that those -- that by a preponderance of the evidence

11  reaches point of applying the terrorism enhancement, but it

12  doesn't mean I can't look at it in assessing all the 3553(a)

13  factors, does it?

14         MR. CLANCY:  Well, no.  That's why I started my

15  discussion with Gall.  The only test on variance, since we're

16  not dealing with a preponderance of evidence on the application

17  of the terrorism enhancement is consideration of the factors and

18  whether a variance is reasonable or not.  Perhaps I'm assisting

19  the government.  It's a lesser threshold.

20         THE COURT:  I just want to make sure I understood the

21  argument.

22         All right.  Mr. Bosse, I'll give you just a minute or

23  two, then we're going to take a short recess before sentencing.

24         MR. BOSSE:  Thank you, Your Honor.

25         I want to talk briefly about that intelligence note.

1  Your Honor has it and can review it.  The context that I think

2  is important is there are statements that Mr. Patel is making in

3  this same late 2016 time period that he is, he is suspicious of

4  the person he's dealing with and he has a concern that he could

5  be law enforcement.  And the statements sort of change as time

6  goes on.  Whether they change because of that, whether they

7  change because Mr. Patel is riding this roller coaster and he's

8  temporarily off of this extremist stuff that he had supported a

9  few months prior, I don't know, and it's hard to say.

10         THE COURT:  But it appeared to give the FBI a medium

11  level of confidence.

12         MR. BOSSE:  It gave an analyst within the FBI.  I work

13  with the counter terrorism section.  This is a different group

14  within the same house.  It's an intelligence analyst, it's not

15  the people working the case.  I'll leave it at that.  That

16  document is what it purports to be.

17         The entire thing makes clear that the concern is that

18  he would reengage with extremism as time went on if he found the

19  FBI was investigating him or if he didn't succeed in finding a

20  job, and that's laid out in the document as well, along with the

21  alternative scenarios that are the government's, what I describe

22  as the forward-looking concern.

23         Briefly, I know we've spent some time here, it's the

24  relevant conduct that he's intending to cover up that is of

25  concern.  And that is that he actually went over and tried to

1  cross over into the Islamic State.  I've had a case where a guy

2  gave small amounts of money to ISIS, and because of the vagaries

3  of the way these types of laws are written, that is looked at

4  very differently than the case and statutes we charged here.

5        But in this case I just note the overt act in a

6  traveler case is the actual travel or the attempt to travel.  We

7  didn't charge it here, but he got, he got right to the doorstep,

8  and again, is lucky -- he's lucky things worked out the way they

9  did, although I'm sure it doesn't seem like that sitting here

10  today.

11        As far as the enhancement versus not the enhancement

12  and the way the guidelines work, I think we probably could have

13  sought -- and certainly at least could have sought the

14  enhancement.  I made the decision in consultation not to seek it

15  and to try to get at what I thought was a sentence that's going

16  to fulfill all the 3553(a) factors the way we did it rather than

17  seeking to max out Mr. Patel in this case.

18        The relevant conduct here is concerning.

19        Specific deterrence I do think is still a

20  consideration.  Even if the Court reads things the way defense

21  counsel reads it, even so, general deterrence is always in

22  effect here.  This is someone who tried to hide who he was to

23  the Army to join the Army, and the thing that he was trying to

24  hide was the thing they would most want to know.  Unbelievably

25  concerning.

1    That's all I have, Your Honor.

2         THE COURT:  All right.  We'll take a short recess.

3         (Recess taken from 11:48 a.m. to 12:03 p.m.)

4         THE COURT:  One thing, those dates, I just want the

5    record to be clear, five weeks between the telephone call and

6    the statements?  Mr. Clancy said November.  That's not five

7    weeks, I don't think.

8         MR. BOSSE:  Your Honor, the...

9         Yes.  That's right.  That's more than that.  I skipped

10   a month.  It's about nine weeks.

11        THE COURT:  All right.

12        MR. BOSSE:  Yes, sir.  November 30th.  Yes, sir.

13        THE COURT:  And on this one documents that Mr. Clancy

14   submitted, it's on Page 6.  So counsel, you all come up and look

15   at it afterward and let's get that page fixed somehow after

16   we're all done.  Substitute it in there.  And you read the one

17   paragraph that I was unable to.  The rest I can make out.

18        So if there are no more, if there's no more argument,

19   I think I'm ready for, Mr. Clancy, you and Mr. Patel to step to

20   the podium.

21        Mr. Patel, I've read your letter carefully, and you do

22   have a right to make a statement.  You don't have to, it's up to

23   you whether you want to make any further statement, but if you

24   wish to do so, I'm happy to hear from you.  Do you wish to make

25   any further statement?

1            THE DEFENDANT:  Yes, Your Honor.

2            THE COURT:  All right.  Go ahead.

3            THE DEFENDANT:  I'm terribly sorry for everything that

4    I've said and done.  I apologize to my family, my friends, my

5    community and my country.  Thank you, Your Honor.

6            THE COURT:  All right.  Thank you, Mr. Patel.

7            Mr. Clancy, is there any reason that sentencing should

8    not take place at this time?

9            MR. CLANCY:  No, sir.

10           THE COURT:  Before sentencing, the Court will review

11   the statutory sentencing factors, which are designed to ensure

12   that the sentence imposed is sufficient but not greater than

13   necessary to comply with the purposes of sentencing.  And I'll

14   consider -- I've considered all of them, but I'll recite many of

15   them.

16           I've also considered the arguments carefully about

17   where the sentence should fall, and whether the sentence -- the

18   Court should impose an upward variance, and if so, the degree to

19   which that should be done.

20           First the nature and circumstances of the offense.

21   That's factor one.  We've talked about that an awful lot.  At

22   the very least we have, you know, we have someone who was

23   visiting the websites, making statements and, you know, goes to

24   China, then leaves, goes, telling his parents that he's going to

25   go to Mecca, but goes to Jordan.  And that fact right there is

1   very interesting, because although, as the defendant points out,

2   he had grown up in the Hindu faith and there was some

3   consternation in the family by virtue of the fact that he had

4   shifted to the Muslim faith.  He was, I guess, at least

5   straightforward enough to tell his parents that he was going to

6   go to Mecca.  So if you were trying to -- if you were saying

7   that to hide from them that you had some interest in Islam, it

8   doesn't seem to do that.  It seems that it would be done for

9   some other more nefarious purpose; i.e. because the defendant

10  was thinking of, as he says in his letter, looking at the

11  possibility of going to Jordan to make his way to the outskirts

12  of the caliphate, the Islamic State caliphate, at the very least

13  the outskirts, I think is the way it may be mentioned in the

14  letter to help to become a martyr, eventually, as the defendant

15  says in his letter.  And it's difficult to thread the needle,

16  you know.  The defendant seems to seek to thread the needle in

17  his letter.  And I'm sure that after the fact you're trying to

18  go back and figure out what was going through your mind, why you

19  did some of these things, why you said some of these things.  Of

20  course it must be taken with a grain of salt.  It's difficult

21  for the Court to know whether this is a calculated statement

22  intended to deceive the Court and/or to shed the most light on

23  what was going through your mind at the time and what your

24  intentions were, or whether it is something else.

25          But those facts are -- some of those facts that I just

1   recited were from the letter that comes after the fact.  But

2   taking the relevant portions of that letter and the statements

3   made about what was happening, what the defendant's intentions

4   were at the time that he was going to Jordan all paints a

5   picture of the nature and circumstances of the offenses here.

6   Because these offenses come in the wake of it.  After all of

7   that.

8        And so the nature and circumstances of activities are

9   very different than someone who lies on their application to the

10  Army or the Air Force -- I know we're here, we're dealing with

11  the Army, but we're looking at all the facts -- but someone who

12  lies on the statements they make to the Army and to the

13  Department of State because they got in some barroom brawl and

14  got arrested while they were overseas, or they were found with

15  some narcotics, for example, or they were possessing or using

16  something, I mean, there's a whole lot of reasons why someone

17  might do it, but you can't divorce yourself here or in any case

18  from the context of the crime and the reason, the purposes

19  behind it.  And at the very least here, it was done to keep the

20  Armed Forces and the, derivatively at least, the Department of

21  State, from finding out about this specific incident in Jordan.

22       But by doing so, again, even giving credit to

23  everything that the defendant has said in his letter, by doing

24  so, it deprived these entities of doing the searches they needed

25  to do to perform their governmental functions, functions that

1   keep the citizens of this country safe, and everyone else in the

2   country, citizens and non-citizens, keeping everyone safe.

3          When the Court looks at the defendant's history and

4   characteristics, of course we've talked about this a lot, so I'm

5   not going to read through every page of the presentence report

6   aloud as I normally do.  The things that stand out -- and I've

7   read and highlighted the things that I thought were important

8   here, I read every single letter, read the position statements

9   carefully -- the things that stand out are, of course, that the

10  defendant's parents had come to this country and they have done

11  well.  Comes from a family that has excelled.  He faced, of

12  course, the challenges of anyone having to make that transition.

13  And then on top of that had the childhood cancer at age 12, the

14  challenges that come with that.  And then, it appears, had the

15  very unfortunate incident of taking the Zoloft and having that

16  set off some sort of psychotic event for him, and the challenges

17  that arose from that and then becoming stable again.

18          And you know, the other side of that is the defendant

19  comes from a very close-knit family and community that provided

20  an awful lot of support for him, and is obviously loved very

21  much by a lot of people when you read these letters.  And so the

22  history and characteristics of the defendant provide much to his

23  credit.

24          We don't have a criminal history to deal with here.

25          Defendant has worked.  He's had an employment history.

1  Clearly worked in the family business, sought other jobs.  He

2  has discussed his frustration at not being able to find jobs in

3  his field after receiving the degree he had in criminal justice

4  and his associated concern that some of that could be the result

5  of prejudice, inappropriate prejudice against him.

6         The Court is required to consider the need for the

7  sentence to reflect the seriousness of the offense.  And as I

8  said, it's very serious, because it deprives the government of

9  the ability to do its due diligence and to make the

10  determinations it must.  There are checks and balances on the

11  determinations that the government makes.  We spend a lot of

12  time and effort to ensure that people get their due process.

13  And so if, if you were to give the defendant the benefit of the

14  doubt and say that what happened was just because he was

15  concerned that he wouldn't get a job, you know, there are ways

16  to deal with that.  You must be open and honest, and then if you

17  think that a decision has been inappropriately made, you appeal

18  the decision.  You take it to whatever level you need to.  And

19  so the gloss, if you will, on the seriousness of the offense

20  when you look at the entire context, is very troubling.

21         The Court is required to also impose a sentence that

22  promotes respect for the law and provides a just punishment.

23  Here, much of this is murky, much of it is not.  The degree to

24  which the statements that the defendant made to the confidential

25  human source, as we get into late 2016, early 2017 and onward,

 1  lacks clarity.  We have the FBI statement as to what one of the

 2  analysts there thought, but we don't know.

 3          So the need to afford adequate deterrence.  The Court

 4  must consider what will deter the defendant from this kind of

 5  activity; again, that is, the criminal activity here.  The

 6  government points out that if we had some kind of mental health

 7  break or issue at the time that these statements were made, it

 8  raises a different specter.  The Court can't really speculate

 9  about that.  But the Court does have to think about specific

10  deterrence to this defendant and general deterrence, and does

11  give that weight.

12          The Court has to protect the public and provide the

13  defendant with any needed education or treatment.

14          The letter the defendant provided is quite

15  introspective.  It reflects the need, perhaps, for some

16  additional counseling.  I think that would be appropriate.

17          And the Court is required to consider the sentencing

18  range here.  I've talked about the kind of normal, sometimes

19  referred to in the guidelines cases as a mine-run case, but in

20  this case, the combination of these two crimes can't be

21  overlooked.  There's force, there's greater weight to the two

22  crimes because one was meant to facilitate covering up the

23  other, and because of all of the context that we've been talking

24  about here.

25          You know, this issue of the CIA letter, I'll address

1  that -- or CIA application, I'll address that for a moment.

2  Frankly I think it cuts both ways.  It's not something that's

3  particularly telling to me, and I don't really fault anybody for

4  not -- at least from the defense side -- for not following up on

5  it.  We don't know exactly what may be discovered.  But it

6  really cuts both ways if it did happen.  Because it doesn't

7  really diminish the possibility about the reason for which the

8  defendant may have been engaging in this activity.  And it

9  doesn't really affect the fact that the activity, the criminal

10  activities here were to cover up what happened in Jordan.  And

11  that is not going to be changed.  And the potential discovery of

12  all these other facts that kind of would probably -- some of

13  which would have been discovered as a result of the Army, the

14  Armed Forces finding out about the trip and what happened there

15  and what may have preceded it.

16        The government -- I think frankly this Fourth Circuit

17  case that we've been talking about recently, the Blue case that

18  requires me to address all non-frivolous arguments for a

19  variance applies with equal force to a request for an upward

20  variance as it does to the normal downward variance that I get.

21  The government's argued -- therefore I'll try to address them,

22  if I haven't.

23        The government's argued that the defendant's acts

24  related to this offense involved support for the ISIS, a

25  designated foreign terrorist organization.  I've talked about

1   that as I tick down the list on the nature and circumstances,

2   they have argued that ISIS has called for violent attacks

3   against the U.S. -- or within the U.S., and the defendant

4   appeared to be receptive to that encouragement and interested in

5   personally participating in such acts.  Again, that's part of

6   the nature and circumstances of the offense when you think about

7   the defendant's fear that the military would follow up on the

8   Jordanian trip and find out about potentially more of what he

9   was saying and doing.  And clearly the defendant traveled

10  overseas with the apparent goal of at least getting very close

11  to ISIS, as he says in his letter, and facilitating the ultimate

12  revolution, as he says, hoping someone else other than ISIS

13  would bring that about.  But he wanted to go there and be close,

14  he says in his letter, so that he could help facilitate and be

15  ready to jump in and join.

16          The government argues that the passport fraud and the

17  false statements were not, as is typically associated with

18  immigration fraud or other less-serious reasons for deceit, but

19  were instead motivated by efforts to secure employment with the

20  U.S. Army while at the same time hiding his ideological

21  motivation for doing so.  I've already addressed that.

22          Ticking down the reasons, the government says the

23  defendant's conduct at a minimum approached conduct sufficient

24  to warrant a substantial terrorism enhancement.  I have stepped

25  away from that, really.  I think that's not a place we go here

1    when we just focus on the 3553(a) factors.

2           The need to protect the public.  The government says

3    the defendant poses a substantial risk to the public after

4    release, as he has praised violent attacks on U.S. soldiers on

5    U.S. military bases and has himself attempted to join the U.S.

6    Army.  There's clearly some reason to be concerned about the

7    future risk, though frankly the statements from the FBI analyst

8    call that into question.  And so the Court considers all of that

9    information in weighing it.

10          The government points out that his detention in Jordan

11   was fortuitous and he may have succeeded in carrying out violent

12   acts.  Well, we just don't know, of course, what might have

13   happened.

14          And we have the statements the defendant made about

15   being elated when violent killings of civilians were successful

16   in Paris and Orlando, and his admiration for ISIS, though of

17   course he stepped back from those statements later.  Whether it

18   was genuine or not we don't know.  I suppose in the same way we

19   don't know the degree to which the defendant may have been

20   puffing in some of his earlier statements.  But the consistency

21   in all these earlier statements and the visit to Jordan is all

22   very troubling.

23          And the defendant also expressed a desire to blend in

24   to society to do something glorious and that he wanted to make

25   non-Muslims suffer, all part and parcel of this.

 1          So having carefully considered all of that, the Court

 2   is now prepared to impose sentence in the case.

 3          Although maybe not.  I think I left something sitting

 4   on my desk.

 5          Matthew?

 6          (Court and law clerk conferred.)

 7          THE COURT:  I will say this:  I'm going to vary

 8   upward.  I'm going to vary upward.  I'm not going vary upward to

 9   the degree that the government has asked me to.  I think this

10   case is different than the kind of cases the Court normally

11   sees.  I think, as I said earlier, the combination of these two

12   things, these two crimes together, is such that it creates a

13   heightened concern for the Court.  And I'm going vary with

14   respect to the sentence, actual sentence imposed, I'm going to

15   vary upward.  I'm going to vary upward on the supervised release

16   term also because of the significant concerns raised here.

17          Pursuant to the Sentencing Reform Act of 1984, it is

18   the judgment of the Court that the defendant, Shivram Patel, is

19   hereby committed to the custody of the United States Bureau of

20   Prisons to be imprisoned for a term of 60 months.  This term

21   consists of 30 months on Count 1 and 60 months on Count 3, to be

22   served concurrently.

23          Defendant is remanded to the custody of the United

24   States Marshal to serve his sentence.

25          Upon release from imprisonment, Mr. Patel shall be

1    placed on supervised release for a term of six years.  This term

2    consists of three years on Count 1 and three years on Count 3,

3    to be served consecutively.

4           Within 72 hours of release from custody of the Bureau

5    of Prisons, the defendant shall report in person to the

6    probation office in the district to which he is released.  He

7    shall refrain from any unlawful use of a controlled substance

8    and submit to one drug test within 15 days of release on

9    supervised release, and at least two periodic drug tests

10   thereafter as directed by the probation officer.

11          While on supervision, Mr. Patel shall not commit

12   another federal, state or local crime, and shall not unlawfully

13   possess a controlled substance and shall not possess a firearm

14   or a destructive device.

15          Mr. Patel shall comply with the standard conditions

16   that have been adopted by this court for people on supervised

17   release.

18          In addition, he shall participate in a program

19   approved by the probation office for mental health treatment.

20   The costs of this program to be paid by him to the extent he's

21   capable, as directed by the probation officer.

22          If he tests positive for illicit drugs, he shall

23   participate in a program approved by the U.S. Probation Office

24   for substance abuse, which program may include residential

25   treatment and testing to determine whether he's reverted to the

1    use of drugs or alcohol, with partial costs to be paid by him,

2    all as directed by the probation officer.

3          He shall waive all rights of confidentiality regarding

4    substance abuse and mental health treatment in order to allow

5    the release of information to the probation office and authorize

6    communication between the probation officer and the treatment

7    provider.

8          He shall not have any contact with any known or

9    purported member of any designated foreign terrorist

10   organization during his period of supervision in light of the

11   factual context of this case.

12         He shall comply with the requirements of the Computer

13   Monitoring Program as administered by the probation office.  He

14   shall consent to the installation of computer monitoring

15   software on any computer to which he has access.  Installation

16   shall be performed by the probation officer, and the software

17   may restrict and/or record any and all activity on the computer,

18   including the capture of keystrokes, application information,

19   Internet use history, email correspondence and chat

20   conversations.  A notice will be placed on the computer at the

21   time of installation to warn others of the existence of the

22   monitoring software.  The defendant shall also notify others of

23   the existence of the monitoring software.  Defendant shall not

24   remove, tamper with, reverse-engineer or in any way circumvent

25   the software.  The costs of the monitoring are to be paid by the

1  defendant to the extent he's capable.

2        During his term of supervision, he shall not possess

3  or utilize any video gaming system, console or other device that

4  would enable contact and/or the sharing of data to individuals

5  known or unknown to the defendant.

6        The Court finds that the defendant is capable of

7  paying a fine.  He shall pay the following penalties:

8        $200.  That's $100 on each count for a special

9  assessment.  No restitution is imposed.

10        The defendant shall pay a fine of 2,000 as to Count 1

11  and 2,000 as to Count 3, for a total of $4,000.  The special

12  assessment and fine is due in full immediately.  Any balance

13  remaining unpaid on it at the beginning of supervision shall be

14  paid by the defendant in installments of not less than $150 a

15  month until paid in full, and the payments shall begin 60 days

16  after supervision starts.

17        At the time it starts, the probation officer can

18  consider defendant's economic status and ask me to make changes

19  to these.  Special assessment and fine payments are subject to

20  penalties for default and delinquency, and nothing in my order

21  prohibits the collection of any judgment or fine by the United

22  States.

23        Payment of these penalties is due during the period of

24  imprisonment to be made to the clerk of this court except those

25  payments made through the Bureau of Prisons Inmate Financial

 1   Responsibility Program.

 2          Defendant shall notify the U.S. Attorney for this

 3   district within 30 days of any change of name, residence or

 4   mailing address until all fines, costs and special assessments

 5   imposed by the judgment in this matter are fully paid.

 6          There's a consent order of forfeiture here which the

 7   Court has entered.

 8          The Court will now also address the manner in which it

 9   reached the upward variance in the case.

10          The defendant's guideline range in this case, as the

11   Court noted at the beginning of this hearing, flows from his

12   offense level 11 and criminal history category I which had

13   resulted in a guideline range of eight to 14 months.  The Court

14   has imposed a guideline range -- excuse me, has imposed a

15   sentence of 60 months.  The Court considered as it moved up the

16   offense levels where moving up those offense levels would bring

17   the Court to a sentence that was sufficient but not greater than

18   necessary to accomplish all these purposes of sentencing.  The

19   government would have had the Court essentially move up to

20   offense level 28 or even 29.  And the Court, once it arrived at

21   offense level 24, concluded that that was a place with a

22   criminal history category I that would satisfy all the purposes

23   of sentencing.

24          Mr. Patel, just a couple other things.

25          As part of the plea agreement, you waived your right

1  to appeal, with the exception of certain ineffective assistance

2  of counsel claims that can be brought on direct appeal.

3  Generally, waivers of appeal are enforceable; however, if you

4  believe that your waiver is unenforceable, then you may present

5  that issue to the U.S. Court of Appeals.  To do that, you must

6  file a notice of appeal within 14 days from entry of judgment in

7  the case.  If you do not file the notice of appeal on time, you

8  may lose your right to appeal.  You have the right to be

9  assisted by an attorney on appeal.  One will be appointed for

10  you by the Court if you cannot afford to hire an attorney.  You

11  may be permitted to file the appeal without payment of the costs

12  if you make a written request to do so.  Also, if you make a

13  request of the clerk's office, someone there will prepare and

14  file the notice of appeal for you.

15          I will recommend that you, consistent with the

16  purposes of the Bureau of Prisons, be housed as close to

17  Virginia as possible so that you can have contact with your

18  family.

19          And I will say this also to you before I ask the

20  government if it has anything else:  You know, everybody here

21  was engaged to some extent in looking into a crystal ball and

22  trying to figure out what has been going on in your mind,

23  particularly more recently.  And I certainly like to think that

24  your letter was a fulsome explanation of the way you perceived

25  what was going on.  And I hope that it does reflect a shift in

1    some of your views.  And I certainly do hope that you will be

2    able to return to the community and do the things that all these

3    letters said so many nice things about you and your background

4    and the kind of person that you have been growing up and the

5    involvement that you've had in the community.

6            And you know, I know your parents are sitting back

7    there, I suspect, just hoping that you are able to make good use

8    of this time -- you're a very young man -- and that you'll be

9    able to come back out and turn things around.  And that's the

10   Court's sincere hope for you, because we hope that every single

11   person in this country does the kind of things that are

12   necessary for them to flourish and to make a good life for

13   themselves and to make the country better.  And that's what we

14   hope for you.

15           THE DEFENDANT:  Thank you, Your Honor.

16           THE COURT:  Mr. Bosse, anything else?

17           MR. BOSSE:  Yes, sir, Your Honor.  The government

18   moves to dismiss Count 2 of the indictment.

19           THE COURT:  Court will dismiss Count 2 without

20   objection.

21           Mr. Clancy, is anything else we need to address?

22           MR. CLANCY:  No, Judge.  I appreciate you making the

23   recommendation, as much as you can, that we keep him as close to

24   his family as possible.

25           THE COURT:  All right.  I wish you well, Mr. Patel.

1              THE DEFENDANT:  Thank you, sir.

2         (Whereupon, proceedings concluded at 12:41 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1              *CERTIFICATION*

2

3        *I certify that the foregoing is a true, complete and*

4   *correct transcript of the proceedings held in the above-entitled*

5   *matter.*

6

7        _____

8              Paul L. McManus, RMR, FCRR

9                    _____

10                    Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25